[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14685

_____

D.C. Docket Nos. 0:13-cv-62111-KAM; 12-bkc-32686-JKO

In Re: NICA Holdings, Inc.,

Debtor.

_____

PETER ULLRICH,

Plaintiff-Appellant,

versus

KENNETH A. WELT,
LESLIE S. OSBORNE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 17, 2015)

Before ED CARNES, Chief Judge, MARTIN, Circuit Judge, and WALTER,[*] District Judge.

MARTIN, Circuit Judge:

This case originated in the U.S. Bankruptcy Court. Peter Ullrich was a substantial investor in a farm that raised tilapia in Nicaragua. The fish farm failed, and we consider claims arising out of a fight for the limited assets that remain from that enterprise.

## I.  BACKGROUND

A.    THE FAILED ABC

Nica Holdings, Inc. ("Nica") is now the debtor in the underlying bankruptcy, but it once had valuable assets. Nica held stock in Mares Nica Noruegos S.A. ("Nicanor"), the company that ran the Nicaraguan fish farm, and it owned several parcels of land associated with that operation. Mr. Ullrich and a Norwegian firm called Biotec Holdings ("Biotec") owned the remaining shares of Nicanor.

By 2007, Nica faced financial problems. As a result, Nica executed what is known as an Assignment for the Benefit of Creditors (ABC) on July 12, 2007. An ABC is a creature of state law (here Florida), which serves as an alternative to bankruptcy. To establish an ABC, one irrevocably assigns their assets to another,

---

[*] Honorable Don Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

then the assignee in turn disposes of those assets in accordance with state law. Kenneth Welt was the assignee for Nica's ABC. He hired Tina Talarchyk of the law firm of Squire Sanders LLP[1] to assist him with the ABC liquidation.

Exactly what happened next is hotly disputed, but at least the following seems to be uncontested. During the ABC, Mr. Ullrich and Biotec independently expressed interest in acquiring control over Nicanor by purchasing its stock from Nica. Mr. Welt, as Nica's ABC assignee, executed a separate sales contract with and accepted a separate deposit from each of the aspiring buyers. Then, without court authorization, he paid himself and other ABC expenses with these deposits. Eventually, Mr. Welt did get court approval for the stock sale to Mr. Ullrich, but Biotec blocked that sale on the basis of certain corporate stock restrictions. The sale to Mr. Ullrich was never consummated. As a result of continuing uncertainty over Nicanor's future ownership, investors stopped investing and the fish farm closed operation. This rendered the Nicanor stock, Nica's primary asset in the ABC, worthless.

Someone—and there's no shortage of finger-pointing—prevented Nica's effective liquidation. Mr. Ullrich blamed Mr. Welt in a civil suit brought in state court ("the Adversary Proceeding") and separately sought his removal as Nica's

---

[1] Squire Sanders LLP is now Squire Patton Boggs, but we will refer to it by its previous name, which was in use when this case began.

3

ABC assignee.  Mr. Welt, in turn, filed a malpractice suit against Ms. Talarchyk and Squire Sanders in state court ("the Malpractice Claim").  These two lawsuits are the only things of value Nica has left.

## B.    THE CHAPTER 7 BANKRUPTCY

After this rush to the courthouse was underway, Mr. Welt purported to file a voluntary Chapter 7 bankruptcy petition on Nica's behalf on September 24, 2012.  He claimed that bankruptcy was "the most expeditious and effective means of administering the remaining assets of Nica" namely the litigation.  Leslie Osborne was appointed trustee ("the Trustee") of Nica's bankrupt estate.

Mr. Ullrich opposed the bankruptcy from the beginning.  He claimed (and continues to claim) that Mr. Welt filed the bankruptcy merely to block his removal as ABC assignee and to insulate himself from personal liability.  Mr. Ullrich moved to dismiss the bankruptcy petition on October 8, 2012, claiming that Mr. Welt lacked the authority to put Nica into bankruptcy.  His motion to dismiss was denied, as was his motion to take an interlocutory appeal from that denial.

## C.    THE ADVERSARY PROCEEDING

Mr. Ullrich's Adversary Proceeding against Mr. Welt was taken over by the Trustee and settled.  First, Mr. Welt removed Mr. Ullrich's state court action to the Bankruptcy Court.  Next, the Trustee claimed the Adversary Proceeding as an asset

of the estate and intervened as sole plaintiff.  Finally, the Trustee moved to settle it ("the Adversary Settlement").

For our purposes, we consider the following terms of the Adversary Settlement: In exchange for (1) control over the Malpractice Claim litigation and recovery, (2) the subordination of Mr. Welt's administrative claims against Nica, and (3) Mr. Welt's partially reimbursable funding of the Malpractice Claim litigation, Mr. Welt would receive a bar order granting him complete personal immunity from pre-petition liability.[2]  Effectively, the Adversary Settlement shut down the Adversary Proceeding against Mr. Welt in favor of pursuing the Malpractice Claim against Ms. Talarchyk and Squire Sanders.

Mr. Ullrich believes this was an improper maneuver that harmed the estate. He objected to the Adversary Settlement, advancing many of the same arguments he raises now.  Several days later, he also filed what he called a competing settlement offer under 11 U.S.C. § 363(b)(1) ("the Competing Settlement Offer"). In the Competing Settlement Offer, Mr. Ullrich offered to (1) litigate the Adversary Proceeding, including paying (partially reimbursable) fees, and (2) litigate the Malpractice Claim jointly with the Trustee (but not on behalf of Mr. Welt), in exchange for (1) barring Mr. Welt's administrative claims, (2) giving Mr.

---

[2] The text of the Settlement Agreement suggests that Mr. Welt receives immunity both personally and in his capacity as ABC assignee.  The latter protection was determined to be a "scrivener's error."  We accept that the Settlement Agreement gave Mr. Welt personal immunity, but no immunity for his acts as ABC assignee.

5

Ullrich priority recovery on some claims, and (3) entering a bar order in Mr. Ullrich's favor. Effectively, the Competing Settlement Offer contemplated pursuing both lawsuits but giving Mr. Ullrich some control over them and some additional reward from them.

## D.    THE SETTLEMENT HEARING AND APPROVAL

On July 15, 2013, the Bankruptcy Court held a hearing on the Adversary Settlement and Mr. Ullrich's objections to it. The court ruled, with little analysis, that the Trustee accepted the Adversary Settlement through "the exercise of business judgment," which "should be upheld." Specifically, the Bankruptcy Court reasoned that the Adversary Settlement was "in the best interest of the estate and of the creditors generally." The agreement also subordinated Mr. Welt's administrative claims and did not release him from liability in his capacity as ABC assignee. The Bankruptcy Court did not discuss the Competing Settlement Offer. Two weeks later, the court issued a summary order granting the Trustee's motion to proceed with the Adversary Settlement and entered a bar order in favor of Mr. Welt personally. Nica's creditors got no payout as a result of the Adversary Settlement. The Adversary Proceeding was later dismissed with prejudice.

Mr. Ullrich appealed the Bankruptcy Court's ruling to the District Court. He argued that the Bankruptcy Court erred by failing to treat the Adversary Settlement as an asset sale under 11 U.S.C. § 363—which would require review of competing

6

bids—and by failing to treat the Competing Settlement Offer as a competing bid. The District Court rejected Mr. Ullrich's arguments, and affirmed the ruling of the Bankruptcy Court.  It found that the Bankruptcy Court had evaluated the Adversary Settlement according to the proper factors, even though it had not explicitly discussed the application of each.  Mr. Ullrich timely filed this appeal.

E.     THE MALPRACTICE CLAIM SETTLEMENT

Shortly before the District Court affirmed the Bankruptcy Court's approval of the Adversary Settlement, the Trustee separately moved the Bankruptcy Court to settle the Malpractice Claim ("the Malpractice Settlement").[3]  Once again relying on his "business judgment," the Trustee proposed a settlement that would impact the estate as follows: (1) Squire Sanders would pay $210,000 to the estate; (2) the estate would keep Mr. Welt's $50,000 contribution toward fees (pursuant to the Adversary Settlement); and (3) Squire Sanders would waive any claims it had against the estate.  Mr. Ullrich quickly moved to stay the Malpractice Settlement and "all proceedings in this Court" due to his concern about equitable mootness if things went forward.  The Bankruptcy Court denied his motion for a stay.

---

[3] Other than a footnote in Mr. Ullrich's initial brief, the Malpractice Settlement is not mentioned in the record before us.  However, we are "free to take judicial notice of subsequent developments in cases that are a matter of public record and are relevant to the appeal." Rothenberg v. Sec. Mgmt. Co., 667 F.2d 958, 961 n.8 (11th Cir. 1982).  The outcome of the Malpractice Claim—one of Nica's two principal assets and the lawsuit deemed superior by the Settlement Agreement—is directly relevant to this appeal.

Mr. Ullrich then objected to the Malpractice Settlement, arguing that the lawsuit was being prematurely settled as well as undervalued, and that the settlement would net little or nothing for Nica's creditors. He also renewed his request for a stay. Once again, when the Bankruptcy Court held a hearing on the Malpractice Settlement, Mr. Ullrich orally moved for a stay. The Bankruptcy Court did not stay the proceedings and it approved the Malpractice Settlement.

Mr. Ullrich persisted. After being told in the written order following the hearing that his oral motion was premature, Mr. Ullrich filed another motion for stay pending appeal. This time the Trustee opposed it, arguing that Mr. Ullrich was actually too late, because the parties already consummated the Malpractice Settlement "[i]mmediately following the Court's oral ruling." After a hearing, the Bankruptcy Court denied Mr. Ullrich's motion for a stay. Squire Sanders has paid the estate and the estate has retained Mr. Welt's fee contribution under the terms of the Malpractice Settlement, but none of the creditors has been paid anything.

## II.  STANDARD OF REVIEW

In bankruptcy appeals, we act as a second court of review, independently examining the decisions of the Bankruptcy Court and applying the same standards as the District Court. Brown v. Gore (In re Brown), 742 F.3d 1309, 1315 (11th Cir. 2014). When the District Court affirms a Bankruptcy Court's order, as here, we consider the Bankruptcy Court's decision directly, reviewing factfindings for

clear error and legal conclusions de novo.  Id.  Questions concerning a court's

subject matter jurisdiction are reviewed de novo.  Mesa Valderrama v. United

States, 417 F.3d 1189, 1194 (11th Cir. 2005).

## III.  DISCUSSION

We are confronted with a pair of threshold questions about whether this case

is properly before us.  First, the Appellees argue that this controversy may be

equitably moot because both the Adversary Proceeding and the Malpractice

Claim—Nica's only assets—have been settled.  Second, Mr. Ullrich renews his

argument that the Bankruptcy Court lacked jurisdiction because Mr. Welt, as an

ABC assignee, had no authority to put Nica into bankruptcy.  We reject the

equitable mootness argument because we find that relief is still possible.  However,

as to the second argument, we come to a different conclusion than the Bankruptcy

Court about whether an ABC assignee may file a voluntary bankruptcy petition on

behalf of the assignor without explicit authorization to do so.

A.    EQUITABLE MOOTNESS

The Appellees note in passing that this case may be equitably moot.

Equitable mootness is a doctrine that permits courts sitting in bankruptcy appeals

to dismiss challenges (typically to confirmation plans) when effective relief would

be impossible.[4]  "Central to a finding of mootness is a determination by an

appellate court that it <u>cannot</u> grant effective judicial relief."  <u>First Union Real

Estate Equity & Mortg. Invs. v. Club Assocs. (In re Club Assocs.</u>), 956 F.2d 1065,

1069 (11th Cir. 1992) (emphasis added).  Deciding whether a case is equitably

moot requires a multifactor analysis:

> Has a stay pending appeal been obtained? If not, then why not? Has the plan been substantially consummated? If so, what kind of transactions have been consummated? What type of relief does the appellant seek on appeal? What effect would granting relief have on the interests of third parties not before the court? And, would relief affect the re-emergence of the debtor as a revitalized entity?

<u>Id.</u> at 1069 n.11.  No single factor is determinative,[5] and a court must consider "all

the circumstances of the case to decide whether it can grant effective relief."  <u>Id.</u> at

1069.  The equitable mootness doctrine seeks to avoid an appellate decision that

---

[4] The equitable mootness doctrine "normally arises where a Chapter 11 reorganization plan is at issue" because it "responds to the particular problems presented by the consummation of plans of reorganization under Chapter 11."  <u>Tech. Lending Partners, LLC v. San Patricio Cty. Cmty. Action Agency (In re San Patricio Cty. Cmty. Action Agency)</u>, 575 F.3d 553, 558 (5th Cir. 2009) (quotations omitted).  As a result, some courts have questioned whether the doctrine applies to Chapter 7 proceedings.  <u>See, e.g.</u>, <u>Szwak v. Earwood (In re Bodenheimer, Jones, Szwak, & Winchell, LLP)</u>, 592 F.3d 664, 668–69 (5th Cir. 2009).  We assume without deciding that equitable mootness applies in the Chapter 7 context, because even if it does, the Appellees have not shown this appeal is equitably moot.  <u>See id.</u> at 669 ("[E]ven if equitable mootness applies in some Chapter 7 bankruptcies, it does not do so here.").  Like the Second Circuit, "we leave to a future panel of our Court the question whether [one] may [] invoke equitable mootness in the context of a Chapter 7 liquidation."  <u>Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)</u>, 772 F.3d 102, 109 n.13 (2d Cir. 2014).

[5] In particular, we have noted that "substantial consummation by itself does not resolve the issue," <u>id.</u> at 1069, and "[d]espite the appearance that a failure to obtain a stay is a blanket discharge of an appellate court's duty to review a bankruptcy court's confirmation order, the fact remains that the absence of a stay does not compel a finding of mootness," <u>id.</u> at 1070 n.13 (emphasis omitted).

"would knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." Miami Ctr. Ltd. P'ship v. Bank of NY, 838 F.2d 1547, 1555 (11th Cir. 1988) ("Miami Center II") (quotation omitted).

Our decision here will not have that effect. First, while the bankruptcy proceedings have not been stayed pending appeal, we must also consider why not. See In re Club Assocs., 956 F.2d at 1069 n.11. It's not entirely for Mr. Ullrich's lack of trying. It's true that he did not move for a stay after the Bankruptcy Court approved the Adversary Settlement on July 15, 2013, which in turn allowed the Adversary Proceeding to be dismissed with prejudice on December 19, 2013. But no third parties were affected by that settlement, and no money was distributed from the estate as a result.[6] The Adversary Settlement was simply a means of dropping the Adversary Proceeding in favor of pursuing the Malpractice Claim. In contrast, the Malpractice Settlement contemplated extinguishing Nica's only remaining asset in exchange for a potential payout to creditors. When Mr. Ullrich

---

[6] The equitable mootness doctrine is primarily concerned with the finality interests of third parties, such as good-faith purchasers or investors, as opposed to the parties before the court—who know better than to heedlessly rely on the ruling below. See, e.g., Miami Ctr. Ltd. P'ship v. Bank of NY, 820 F.2d 376, 379 (11th Cir. 1987) ("Miami Center I") ("The rationale in these cases . . . is that a court cannot order relief without compromising the integrity of the sale of the property to a good faith purchaser."); In re Club Assocs., 956 F.2d at 1070 (noting concern over the fact that "a number of investors, who were not parties to this case, had committed new funds to the [revitalized debtor] with the expectation of receiving a preferred return on their investments").

11

became aware of this, he quickly and diligently sought a stay.  But his motions were repeatedly denied—first for being too early, then for being too late.  If we are to believe that Mr. Ullrich's oral motion at the end of the Malpractice Settlement hearing was "premature", while his written motion was too late because the parties had consummated the settlement "[i]mmediately following the Court's oral ruling [at the hearing]," then apparently there was never a time when Mr. Ullrich could file a motion to stay the Malpractice Settlement.  On this record, we cannot fault him for not getting a stay.

Second, it's not clear that the two settlements have been substantially consummated, as we understand that term.  The U.S. Bankruptcy Code defines "substantial consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2) (emphasis added).  It is important to note, and the Appellees agree, that no creditors have yet been paid anything as a result of either settlement.  Instead of being distributed, what few funds were transferred as a result of the settlements remain in the bankrupt estate.  This case is not like Miami Center I, where the plan was substantially consummated because a $250 million property had been conveyed to a good-faith purchaser and "the trustee ha[d] paid the

12

undisputed claims of all creditors." 820 F.2d at 380.  Here, a relatively small sum

of $260,000[7] has been paid by two interested—possibly blameworthy—parties into

the estate, where the money remains.  These facts do not fit the statutory definition

of "substantial consummation."

Even if they did, the "kind of transactions" involved here are neither

particularly complicated nor irreversible.  In re Club Assocs., 956 F.2d at 1069

n.11.  The settlements do not contemplate a revitalization of Nica that would be

thwarted by our decision.  They do not involve intricate third-party transactions or

otherwise present a substantial obstacle to relief.  Again, they involve the

straightforward settlement of litigation claims in exchange for the payment of lump

sums by two interested and perhaps blameworthy parties—Mr. Welt and Squire

Sanders.[8]  This contrasts starkly with the types of transactions in appeals we have

ruled equitably moot.  See generally, e.g., In re Club Assocs., 956 F.2d 1065 (plan

that involved large securities offering to third-party investors and partners,

---

[7] This amount represents Squire Sanders's $210,000 payment to the estate plus Mr. Welt's $50,000 fee contribution under the terms of the Malpractice Settlement.

[8] While the settlement payments are easily reversible, somewhat more difficulty may arise from the dismissals with prejudice of the Adversary Proceeding and the Malpractice Claim, on which the statute of limitations has apparently run.  However, because we conclude in Part III.B, infra, that the ABC assignee lacked authority to initiate this bankruptcy in the first place, such difficulties should be mitigated.  The state dismissals were based on orders from an unauthorized bankruptcy, and the limitation period expired during this bankruptcy.  In these circumstances, the claimants may well be able to revive their suits by operation of equitable tolling.  See Sandvik v. United States, 177 F.3d 1269, 1271 (11th Cir. 1999) (per curiam) ("Equitable tolling is appropriate when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence.").

13

restructuring of multimillion-dollar note, payment of all administrative expenses, payment of all trade creditors, repayment of all tenant security deposits, restructuring of another note, and assumption of a management contract); Miami Center I, 820 F.2d 376 (plan that involved substantive consolidation of five debtors, creation of a liquidating trust of all the debtors' assets, payment of creditor claims, purchase of a $250 million building project, significant financing commitments by a bank, a special priority scheme, and dismissal of pending litigation).  These transactions are much simpler.

Our equitable mootness analysis, as applied to the facts and circumstances of this case, leads us to conclude that effective relief is not precluded here.  Perhaps Mr. Ullrich should have tried to stay the Adversary Settlement pending appeal in the same way he tried to stay the Malpractice Settlement.  But his failure to do so is not fatal to this appeal.  See Russo v. Seidler (In re Seidler), 44 F.3d 945, 948 (11th Cir. 1995) ("Failure to obtain a stay of proceedings related to the bankruptcy does not automatically render an appeal moot.").  Equitable mootness does not dictate dismissal here.

B.    AUTHORITY TO FILE

Mr. Ullrich argues that the Bankruptcy Court had no jurisdiction over this case because Mr. Welt lacked the authority, as an ABC assignee, to put Nica into bankruptcy.  To the extent he argues the Bankruptcy Court lacked jurisdiction even

14

to decide the authority-to-file question, Mr. Ullrich is surely wrong.[9]  "[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction."  United States v. Ruiz, 536 U.S. 622, 628, 122 S. Ct. 2450, 2454 (2002).  Indeed, bankruptcy courts have consistently ruled on authority-to-file questions after implicitly assuming jurisdiction pursuant to 28 U.S.C. § 1334.[10] See generally, e.g., Winter v. Bel-Aire Invs., Inc. (In re Bel-Aire Invs., Inc.), 97 B.R. 88 (Bankr. M.D. Fla. 1989); In re Am. Int'l Indus., Inc., 10 B.R. 695 (Bankr. S.D. Fla. 1981); In re Al-Wyn Food Distribs., Inc., 8 B.R. 42 (Bankr. M.D. Fla. 1980).  Rather than dismissing the case for lack of subject matter jurisdiction based on an authority-to-file challenge, these courts rightly assumed jurisdiction in order to address the challenge.  The Bankruptcy Court here was not wrong to do the same.  Its ruling once it got to the merits, however, was wrong.[11]

As we discussed, an ABC is a state-law alternative to bankruptcy.  The idea is that bankruptcies have a spate of potentially useful but complex procedures and protections, while ABCs may offer a simpler and cheaper process.  See generally Jeffrey Davis, Florida's Beefed-Up Assignment for the Benefit of Creditors as an

---

[9] Counsel seems to have conceded as much at oral argument.

[10] Section 1334(a) states that "district courts shall have original and exclusive jurisdiction of all cases under title 11."  28 U.S.C. § 1334(a).

[11] We reject the Appellees' contention that Mr. Ullrich waived his authority-to-file argument on appeal.  He has challenged the propriety of this bankruptcy from the beginning, and he repeatedly raised the issue during the proceedings below, in both the Bankruptcy Court and the District Court.  Although the District Court does not seem to have addressed the argument, its failure to do so does not convert Mr. Ullrich's diligent presentation of the issue into a waiver.

Alternative to Bankruptcy, 19 U. Fla. J. L. & Pub. Pol'y 17 (2008).  Entities may opt to use the ABC process because, in their particular circumstance, it's more flexible, faster, more private, and less supervised than bankruptcy.  See Jonathan T. Edwards, The Crossroads: The Intersection of State Law Remedies and Bankruptcy, 18 J. Bankr. L. & Prac. 2, Art. 4 (April 2009).  Florida courts have described the ABC as "an alternative to bankruptcy [that] allows a debtor to voluntarily assign its assets to a third party in order to liquidate the assets." Hillsborough Cty. v. Lanier, 898 So. 2d 141, 143 (Fla. 2d DCA 2005).  ABCs and bankruptcies are alternative proceedings.  An entity deliberately chooses to pursue one or the other.

Nica certainly did.  When it selected Mr. Welt to serve as its ABC assignee and irrevocably transferred its assets to him, Nica intended the application of a specific statutory mechanism, and conferred powers consistent with that scheme. Nica did not, however, grant Mr. Welt the freewheeling power to pull it out of the very framework from which his powers as assignee arose and plunge it into a different legal system not of its choosing.  To the extent any entity would ever desire to confer such a power in these circumstances, it must do so explicitly and plainly.  We will not read this extraordinary power into the template language from Florida's ABC statute.

"It is well-settled that a bankruptcy filing is a specific act requiring specific authorization." In re N2N Commerce, Inc., 405 B.R. 34, 41 (Bankr. D. Mass. 2009) (quotation omitted) (collecting cases). In determining whether a bankruptcy filing was authorized, we look to state law. Price v. Gurney, 324 U.S. 100, 106, 65 S. Ct. 513, 516 (1945) ("If the District Court finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the petition."). Florida courts have long held that the authority to file a bankruptcy petition rests with a corporation's board of directors.[12]  See, e.g., In re Bel-Aire Invs., Inc., 97 B.R. at 89–90 ("There is no question that the authority to manage the affairs of the corporation does not include the right to file a [bankruptcy] petition."); In re Am. Int'l Indus., Inc., 10 B.R. at 696–97 (requiring "a specific resolution of the board of directors authorizing the action" in order to file a voluntary Chapter 7 bankruptcy petition); In re Al-Wyn Food Distribs., Inc., 8 B.R. at 43 ("The few cases that have been reported on this topic are old, but they are uniform in result. They hold that the president of a corporation has no general power to file a petition, nor is such a power implied. . . . [T]he filing of any sort of bankruptcy petition is a special act requiring special authorization.") (emphasis added)).  Thus,

---

[12] The same is true of most other courts. See In re Arkco Props., Inc., 207 B.R. 624, 628 (Bankr. E.D. Ark. 1997) ("In virtually every instance, this authority [to file bankruptcy petitions] has been held to rest solely with the board of directors.").

17

in order to decide whether Mr. Welt had the power to singlehandedly take Nica from its ABC into bankruptcy, we must examine whether Nica ever granted him "specific," "special" authorization to do so.

Mr. Welt drew his powers as ABC assignee from the ABC agreement executed on July 12, 2007. This agreement tracks almost exactly the language of Florida's ABC statute.[13]  Compare Doc. 20-2, with Fla. Stat. § 727.104(b).  The relevant provisions are set out below:

> The ASSIGNEE shall take possession and administer the estate in accordance with the provisions of chapter 727, Florida Statutes, and shall liquidate the assets of the ESTATE with reasonable dispatch and convert the ESTATE into money, collect all claims and demands hereby assigned as may be collectible, and pay and discharge all reasonable expenses, costs, and disbursements . . . .
>
> If funds of the ESTATE shall not be sufficient to pay [] debts and liabilities in full, then the ASSIGNEE shall pay from funds of the ESTATE such debts and liabilities, on a pro rata basis and in proportion to their priority as set forth in s. 727.114, Florida Statutes.
>
> . . . .
>
> To accomplish the purposes of this assignment, the ASSIGNOR hereby appoints the ASSIGNEE its true and lawful attorney, irrevocable, with full power and authority to do all acts and things which may be necessary to execute the assignment hereby created; to demand and recover from all persons all assets of the ESTATE; to sue

---

[13] The few deviations are immaterial to this case.  In the fifth paragraph, the ABC agreement omits "and protect and preserve" from the sentence beginning: "The assignee shall take possession of, and protect and preserve, all such assets and administer the estate in accordance with the provisions of chapter 727 . . ." Fla. Stat. § 727.104(b).  In the seventh paragraph, the ABC agreement uses "In the event that" instead of "If." Id.  Neither of these differences speaks to the assignee's authority to file a bankruptcy petition on the assignor's behalf.

18

for the recovery of such assets; to execute, acknowledge, and deliver all necessary deeds, instruments, and conveyances; and to appoint one or more attorneys under her or him to assist the ASSIGNEE in carrying out her or his duties hereunder.

The ASSIGNOR hereby authorizes the assignee to sign the name of the ASSIGNOR to . . . any instrument in writing, whenever it shall be necessary to do so, to carry out the purpose of this assignment.

The ASSIGNEE hereby accepts the trust created by the assignment, and agrees with the ASSIGNOR that the ASSIGNEE will faithfully and without delay carry out her or his duties under the assignment.

Doc. 20-2:2–3 (emphasis added).  Clearly, none of this language authorizes (much less, specifically or specially authorizes) the assignee to initiate bankruptcy proceedings.[14]  Bankruptcy is never mentioned in the ABC agreement or in the form language from the Florida statute.  Instead, as one would expect, the procedures, rights, and duties associated with an ABC proceeding are thoroughly delineated, with repeated references to Florida's ABC statute and none to the U.S. Bankruptcy Code.

Under Florida law, that should be the end of it.  See In re Al-Wyn Food Distribs., Inc., 8 B.R. at 43 (noting that power to file a bankruptcy petition will not be implied, but rather "is a special act requiring special authorization").  Without specific authorization to file a bankruptcy petition, Mr. Welt lacked the authority to

---

[14] We have not located—and the parties have not identified—any Florida case law addressing whether the ABC statute confers authority to file a bankruptcy petition on an assignee.

do so.  But one might still claim (as the Bankruptcy Court did) that the residual power granted to an ABC assignee by the power-of-attorney paragraphs is broad enough to encompass the authority to file a bankruptcy petition.  As this argument goes, the ABC agreement granted Mr. Welt "full power and authority" to do anything, including signing Nica's name to "any instrument in writing"—such as a voluntary bankruptcy petition.

However, this argument overlooks the full import of those clauses, which all come back to giving only the authority "necessary to execute the <u>assignment</u> hereby created" and "necessary . . . to carry out the purpose of this <u>assignment</u>." Fla. Stat. § 727.104(b) (emphasis added); Doc. 20-2:2–3 (emphasis added).  These power-of-attorney paragraphs gave Mr. Welt broad power to act on behalf of Nica, yes, <u>but only in furtherance of the ABC</u>.  Pulling Nica out from the ABC and casting it into bankruptcy did not "execute the assignment" or "carry out [its] purpose."  Just the opposite—it terminated the assignment.  We cannot say that Florida's ABC statute carries within it the seeds of its own destruction.  Its form language, which "shall be" adopted "in substantially the [listed] form" in all ABCs, Fla. Stat. 727.104(b), does not grant an assignee the authority to unilaterally override the assignor's original choice of a legal regime.  Absent explicit and plain authorization by the assignor, a Florida ABC assignee cannot initiate Chapter 7 bankruptcy proceedings.

Nica deliberately selected an ABC as its preferred mode of liquidation and executed an agreement manifesting that intent, consistent with Florida law.  It trusted Mr. Welt to "faithfully and without delay carry out her or his duties under the assignment."  Fla. Stat. § 727.104(b); Doc. 20-2:3.  He didn't do that.  Instead, when trouble started, he terminated the ABC by purporting to send Nica into bankruptcy.  Mr. Welt had no such authority.  We therefore REVERSE and REMAND with instructions to the District Court to remand to the Bankruptcy Court for dismissal of the bankruptcy case.

**REVERSED and REMANDED.**