BATCHELDER, J.,
delivered the opinion of the court in which McKEAGUE, J., joined. MOORE, J. (pp. 805-14), delivered a separate dissenting opinion.
OPINION
ALICE M. BATCHELDER, Circuit Judge.
This appeal arises out of the City of Detroit, Michigan’s municipal bankruptcy under Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 109(c). In resolving its bankruptcy, the City crafted a complex network of settlements and agreements with its thousands of creditors and stakeholders, memorialized those agreements in a comprehensive Plan, and obtained the bankruptcy court’s ratification of that Plan in a final Confirmation Order. One aspect of the plan involved the reduction of certain municipal-employee pension benefits under the City’s General Retirement System (GRS). Several GRS pensioners, resisting any reduction in their benefits, challenged the Confirmation Order in the district court. The City moved the district court to dismiss those actions as equitably moot and the court agreed, dismissing them pursuant to Federal Rule of Civil Procedure 12(b)(1). When those pensioners appealed here, we consolidated their appeals and, finding that equitable mootness applies and prohibits their challenges to the Confirmation Order, we AFFIRM.
I.
• The City of Detroit filed for municipal bankruptcy on July 18, 2013, pursuant to Chapter 9 of the Bankruptcy Code, 11 U.S.C. § 109(c). At the time of filing, the City had over $18 billion in escalating debt, over 100,000 creditors, hundreds of millions of dollars of negative cash flow, crumbling infrastructure (e.g., some 78,000 abandoned structures, half classified as “dangerous”; another 66,000 blighted vacant lots; a crumbling water and sewer system; 40% nonfunctioning streetlights; outdated computer systems and software), and could not provide “the basic police, fire[,] and emergency medical services that its residents need[ed] for their basic health and safety.” In re City of Detroit, 504 B.R. 191,192 (Bankr. E.D. Mich. 2013).
In bankruptcy, the City crafted a series of “intricate and carefully woven” settlements with almost all of its creditors and stakeholders. Those settlements were memorialized in the Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (“Plan”). After extensive hearings, the bankruptcy court confirmed the Plan in a Confirmation Order dated November 12, 2014.
The appellants here are párticipants ’ in the City’s General Retirement System (“GRS”)—City employees, retirees, or beneficiaries thereof—who oppose the provi *796 sions of the Plan that reduce their pension benefits; that is, they want the full benefits the City promised them prior to bankruptcy. The GRS has two components: a traditional pension plan (“GRS Defined Benefit Plan” or “Pension Plan”) and a 401(k)-style employee-contribution retirement savings program (“GRS Annuity Savings Fund” or “ASF”). The City is the sole sponsor of the Pension Plan and fully responsible for its funding (or deficiency thereto). The City is not responsible for funding the ASF, but some $387 million of City money had been wrongly directed into it (and distributed from it) in order to ensure- each participant a promised 7.9% annual return regardless of the returns on the ASF investments, and the bankrupt City was obliged to recoup that money. That, however, would be easier- said than done given the magnitude and complexity of the situation.
Moreover, the Pension Plan was underfunded by some $1,879 billion and the City did not have, and would not have, the resources to fully fund it over time. The City was therefore faced with having to reduce each GRS pension by 27%. Instead, the City . orchestrated the “Grand Bargain,” in which-it obtained “outside funding” to bolster the Pension Plan in exchange for a settlement of GRS claims at less than the full promised pension amount. The outside funding, which totaled $816 million, came from agreements by and among the City, the State of Michigan, and certain philanthropic foundations. The “Global Retiree Settlement” between the City and the GRS Board of Trustees[1] reduced all GRS pensions by 4.5% and eliminated cost-of-living increases; reduced retiree healthcare coverage and eliminated dental, vision, and life insurance; and set out a mechanism for the partial recoupment of excess ASF distributions.[2] The GRS -pension claimants (designated “Class 11” for purposes of bankruptcy) voted 73% in favor of accepting the Plan, including the Grand Bargain and the Settlement.[3]
Overall, the Plan eliminated approximately $7 billion in debt and freed approximately $1.7 billion in revenue for reinvestment into City services and infrastructure, including public services, blight remediation, information technology, and public transportation. The Plan took effect on December 10, 2014, and the City began implementation' immediately. As the district court noted in an opinion dated September 29, 2015, the City had by that date already issued $287.5 million in bonds and $720 million in new notes; irrevocably transferred all Detroit Institute of Art assets to a perpetual charitable trust; recouped money from all but five ASF account holders; transferred certain real property interests pursuant to separate settlement agreements within the Plan; and implemented a two-year City budget. See In re City of Detroit, No. 14-CV-14872, 2015. WL 5697702, at *3 (E.D. Mich. *797 Sept. 29, 2015).[4] In its briefs on appeal, filed in January and February 2016, the •City identified numerous additional asr peets of the Plan that have been implemented or completed, including: the City issued over $1 billion in bonds; the State of Michigan transferred $195 million to the retirement systems; the Detroit Institute of Art and others transferred $23 million to the retirement systems; the retirement systems reduced pension amounts as planned in the Global Retiree Settlement and adopted new methods of governance and financial oversight; the City optioned the sale or lease of certain real estate, including the Joe Lewis Arena and the Windsor Tunnel; the emergency manager resigned, restoring day-to-day management to the mayor and city council; the Governor terminated the City’s financial emergency status and removed the City from receivership, though maintaining oversight of the City’s finances via the Michigan Financial Review Commission; the City cooperated in the creation- of the Great Lakes Water Authority to provide water and sewer services; the City established the Beneficiary Associations to provide healthcare to municipal retirees; the City invested millions in public services, including $8.4 million to the police department, $3.8 million to the fire department, $3.5 million for blight remediation, and $1.9 million for information technology; and the City paid to settle with certain claimholders, including $72 million oh the City’s limited-tax general obligation bonds (Class 7), $288 million on the City’s unlimited-tax general obligation bonds (Class 8), $88-million on certificates of participation (Class 9),. $493 million to the Beneficiary Associations (Class 12), $3.7 million on claims regarding the Downtown Development Authority (Class 13), and some $21 million to settle other various unsecured claims (Class 14).
Several GRS pensioners (Class 11 claimants) appealed to the district court, challenging the reduction in their pensions, the ASF Recoupment, and other things, including a release provision that prevented retirees from asserting claims against the State of Michigan. They urged the court to strike the challenged provisions from the Confirmation Order and remand to the bankruptcy court with instructions to exempt pensions from adjustment. In response, the City moved to dismiss the appeals as equitably moot and the court agreed, concluding that “[a]ll three factors of the equitable mootness analysis weigh in favor of dismissing appellants’ appeal as moot: appellants did not obtain a stay; the confirmed Plan has been substantially consummated; and reversal of the Plan would adversely impact third parties and the success of the Plan.” In re City of Detroit, 2015 WL 5697702 at *8. Granting the City’s motion, the district court dismissed the appeals pursuant to Federal Rule of Civil Procedure 12(b)(1).
When those GRS pensioners appealed here, we consolidated their five separate appeals.[5] While these appellants, together, *798 raise several diverse issues or arguments, the determinative issue is the applicability of the equitable mootness doctrine in this case, including challenges to its continued vitality as a prudential doctrine and its availability in any Chapter 9 bankruptcy case. Ultimately, therefore, our determination that equitable mootness' applies to these facts and to this Confirmation Order ends this appeal and forecloses any other claims or arguments.
II.
We review the district court’s equitable mootness determination de novo. In re United Producers, Inc., 526 F.3d 942, 947 (6th Cir. 2008). Equitable mootness is not technically “mootness”—consti-tutional or otherwise—but is instead “a prudential doctrine that protects the need for finality in bankruptcy proceedings and allows third-parties to-rely on that finality” by “preventing] a court from unscrambling complex bankruptcy reorganizations when the appealing party should have act ed before the plan became extremely difficult to retract.” In re Ormet Corp., 355 B.R. 37, 40-41 (S.D. Ohio 2006) (relying on In re Grimland, Inc., 243 F.3d 228, 231 (5th Cir. 2001), and In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000)). That is, unlike conventional mootness, equitable mootness is not concerned with the court’s ability or inability to grant relief; it is concerned with protecting the good faith reliance interests created by implementation of the bankruptcy plan from being undone afterwards. See In re UNR Indus., Inc., 20 F.3d 766, 769 (7th Cir. 1994) (“There is a big difference between inability to alter the outcome (real mootness) and unwillingness to alter the outcome (‘equitable mootness’).”).
More akin to waiver or forfeiture (or perhaps estoppel) than to conventional mootness, equitable mootness is “grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable,” See In re United Producers, 526 F.3d at 947 (internal quotation marks omitted). Stated bluntly, equitable mootness negates appellate review of the confirmation order or the underlying plan, regardless of the problems therein or the merits of the appellant’s challenge. Cf. In re Made in Detroit, Inc., 414 F.3d 576, 581 (6th Cir. 2005).
We analyze equitable mootness under a three-part test: (1) whether a stay has been obtained; (2) whether the plan has been “substantially consummated!’; and (3) whether the relief requested would significantly and irrevocably -disrupt, the implementation of the plan or disproportionately harm the reliance interests of other parties not before the court. See In re United Producers, 526 F.3d at 947-48 (quotation marks and citations omitted). Whether a stay of implementation of the plan has been obtained is significant--because:
When an appellant does not obtain a stay of the implementation of a confirmation plan, the debtor will normally implement the plan and reliance interests will be created. Thus, the failure to obtain a stay will count against the appellant in determining whether an appeal should be denied on equitable mootness grounds. The failure to seek a stay ... is not necessarily fatal ... [but neither is merely seeking a stay sufficient in and of itself, as] a stay not sought, and a stay sought and denied, lead *799 equally to the implementation of the plan of reorganization.
Id. at 948 (quotation marks, editorial marks, citations, and paragraph break omitted).
We measure “substantial consummation” by the Bankruptcy Code definition, which considers the extent of the debtor’s transfer of property, assumption of responsibilities, and distribution of assets as prescribed by the plan. See 11 U.S.C. § 1101(2). “If a plan has been .substantially consummated there is a greater likelihood that overturning the confirmation plan will have adverse effects on the success of the plan and on third parties.” In re United Producers, 526 F.3d at 948. But even after substantial consummation, equitable mootness is not necessarily appropriate. Id. The most important factor is whether the relief requested would affect the rights of third parties or the overall success of the plan. Id. This requires a case-by-case assessment of the feasibility and effect of the relief requested, and determination of “whether it amounts to a piecemeal revision of the plan or a wholesale rewriting of it.” Id.
In this case, all three factors favor the application of equitable mootness: the appellants did not obtain a stay; the Plan has been substantially consummated, inasmuch as numerous significant—even colossal—actions have been undertaken or completed, many irreversible; and the requested relief of omitting the bargained-for (and by majority vote agreed-upon) pension reduction would necessarily rescind the Grand Bargain, its $816 million in outside funding, and the series of other settlements and agreements contingent upon the Global Retiree Settlement, thereby unravelling the entire Plan and adversely affecting countless third parties, including, among others, the entire City population. See In re City of Detroit, 2015 WL 5697702 at *8.
This is not a close call. In fact, the doctrine of equitable mootness was created and intended for exactly this type of scenario, to “prevent[ ] a court from unscrambling complex bankruptcy reorganizations” after “the plan [has become] extremely difficult to retract.” See Nordhoff Investments, Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001). The Grand Bargain was contingent on the Global Retiree Settlement as negotiated. Altering the pension reduction would mean rescinding the Global Retiree Settlement and, consequently, nullifying the Grand Bargain. Given the immensity of the Grand Bargain, even within this enormous bankruptcy, such a drastic action would unavoidably unravel the entire Plan, likely force the City back into emergency oversight, and require a wholesale recreation of the vast and complex web of negotiated settlements and agreements. At this point, the harm to the City and its dependents— employees and stakeholders, agencies and businesses, and 685,000 residents—so outweighs the harm to these appellants that granting their requested relief and unra-velling the Plan would be “impractical, imprudent, and therefore inequitable.” See In re United Producers, 526 F.3d at 947. In short, this is the scenario that equitable mootness was designed to avoid.
III.
The appellants raise two challenges without regard to the particular facts of this case. First, they argue that equitable mootness, being an abdication of our jurisdiction on prudential grounds, is no longer a viable doctrine under the Supreme Court’s evolving ease law. In the alternative, they argue that equitable mootness does not apply in Chapter 9 *800 bankruptcies.[6]
A.
The appellants point to recent Supreme Court opinions in which the Court reversed judgments that had dismissed cases on prudential grounds, and emphasize the Court’s language in those opinions about the obligation of the federal courts to decide cases' within them jurisdiction. See, e,g., Lexmark Intern., Inc. v. Static Control Components, Inc., — U.S.-, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392 (2014) (reversing a dismissal based on “prudential standing” or “statutory standing,” though the issue was whether the' statute authorized suit by the named plaintiff); Susan B. Anthony List v. Driehaus, — U.S. -, 134 S.Ct. 2334, 2347, 189 L.Ed.2d 246 (2014) (questioning but declining to “resolve the continuing vitality of the prudential ripeness doctrine,” upon acknowledging its “tension with [the Court’s] recent reaffirmation of the principle that a federal court’s obligation to hear and decide cases within its jurisdiction is virtually unflagging” (quotation marks and citations omitted)); Zivotofsky v. Clinton, — U.S. -, 132 S.Ct. 1421, 1427, 182 L.Ed.2d 423 (2012) (emphasizing the narrowness of the judicial-question doctrine, and opining that “the Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid” (quotation marks and citation omitted)).
That is a fair reading of those cases and the inference drawn is not unreasonable; the Supreme Court has expressed disfavor for prudential doctrines that abdicate jurisdiction and has emphasized the duty federal courts have to exercise jurisdiction. But those are not bankruptcy cases and their holdings neither expressly nor necessarily extend to equitable mootness.
More importantly, even if the Supreme Court would abolish equitable mootness, it has not yet done so (nor has any circuit). Equitable mootness is the law of the Sixth Circuit, see In re United Producers, 526 F.3d at 947, and wé continue to apply it, see In re Schwartz, 636 Fed.Appx. 673 (6th Cir. 2016). Consequently, we cannot reject it or abolish it in this appeal. See Salmi v. Sec’y of Health & Human Servs., 774 F.2d 685, 689 (6th Cir. 1985) (explaining that one panel cannot overrule the decision of another panel). Equitable mootness is a viable doctrine.
B.
The appellants also argue that even if equitable mootness survives, it does not apply in Chapter 9 cases.[7] As they point out, we in the Sixth Circuit have never before applied equitable mootness in a Chapter 9 case, applying it until now only in Chapter 11 cases. Several other courts have extended it to Chapters 7 and 13, but only three opinions nationwide have ever applied it in Chapter 9, and those did so with little analysis. See Alexander v. Barn- *801 well Cnty. Hosp., 498 B.R. 550 (D.S.C. 2013); In re City of Vallejo, 551 Fed.Appx. 339 (9th Cir. 2013); In re City of Stockton, 542 B.R. 261, 273-74 (9th Cir. BAP 2015) (citing with approval In re City of Detroit, 2015 WL 5697779, on appeal here, and rejecting or distinguishing Bennett, see infra, “because the constitutional and political concerns that troubled [it] [we]re not present”).
The appellants, however, rely on the only other opinion to consider equitable mootness in the Chapter 9 context, an Alabama district court case (currently pending on appeal in the 11th Circuit) that declared equitable mootness inapplicable in Chapter 9 cases: Bennett v. Jefferson County, 518 B.R. 613 (N.D. Ala. 2014). In Bennett, when Jefferson County was forced into bankruptcy by the overwhelming cost of its sewer system, one aspect of its plan was a drastic increase in sewer rates; the Bennett appellants (representing all municipal “Ratepayers” and designated as such) claimed that the increase in rates—without vote or voter approval— violated the state constitution. Id. at 628-29. Jefferson County moved to dismiss the appeal on the basis of equitable mootness, but the court refused, because, among other reasons, the County-Ratepayer relationship was significantly different from the normal debtor-creditor relationship in a Chapter 11 bankruptcy. See id. at 634-35. As the sole public-utihty-sewer-service provider, Jefferson County was a monopoly enterprise and the Ratepayers were captive customers whose only protection from such increases was the political process (i.e., the right to vote on proposed rate increases and the office holders responsible), which the bankruptcy order denied them:
The Ratepayers are not investors or shareholders whose stake in this case is limited to the amount of their investment; they are citizens of the County dependant [sic] upon the' County for provision of basic sewer service. As such, they are the revenue source for payment of the New Sewer Warrants; however, their interest is not limited to a finite financial amount. Rather, their interest in continuing to receive essential sewer service is not protected by the political system of County governance nor do they have a voice in future rate-making.
Id. at 638 (footnote omitted). The Bennett court denied Jefferson County’s motion to dismiss on the basis of equitable mootness and allowed the appeal to proceed on the merits. Id. at 640.
Even though the circumstances in Bennett are validly distinguished from the usual equitable mootness scenario, this does not require the conclusion that equitable mootness does not apply in any Chapter 9 case. Instead, the better conclusion drawn from Bennett's facts is that Jefferson County could not meet the third equitable mootness factor under a “‘case-by-case’ assessment,” see In re United Producers, 526 F.3d at 948. Because of the unusual circumstances, the potential harm to third-party reliance interests from unraveling the Jefferson County plan would not outweigh the harm inflicted on those captive Ratepayer “creditors” by allowing the plan’s drastic rate increase to go unchallenged, Consequently, the application of equitable mootness was not appropriate (i.e., not equitable) in that particular fact scenario.
In the present case, the GRS pensioners/appellants were promised an amount certain and, though perhaps not traditional “creditors” in the most ordinary sense, they are—importantly—not non-party, captive customers like the Ratepayers in Bennett, at risk of being subjected to an unlimited financial obligation, namely, a 365% rate increase to continue forever. *802 Moreover, , unlike the Ratepayers in Bennett who were denied a vote on that increase (that being their primary complaint, in fact), these pensioners, • as Class 11 claimants, were given a vote on the pension reduction and 73% of the Class voted for it. Presumably, the appellants here voted against it, but they were given an opportunity in public hearings to present argument and evidence, and they were given a vote.[8]
The facts in Bennett are drastically different from the facts in this case, and Bennett’s rationale and conclusion are simply not applicable here, where we do not have a deprivation of the political process, a class of otherwise uninvolved participants (captive customers) as creditors, or imposition of an unlimited price increase on them. Moreover, one could reasonably submit that Bennett’s especially unusual facts make it a poorly suited case for a universal proclamation that- equitable mootness never applies in Chapter 9 bankruptcies. But the Bennett opinion contains no hesitancy or self-restraint, announcing unequivocally that “equitable mootness does not apply to challenges to a Confirmation Order in Chapter 9 proceedings.” Bennett, 518 B.R. at 635.
In rejecting Jefferson County’s contention that equitable mootness applies “in Chapter 9 appeals exactly as it applies in Chapter 11 appeals,” id., the Bennett opinion touts the differences between Chapter 9 “municipal reorganization” and Chapter 11 “general reorganization”: “first, the law must be sensitive to the issue of the sovereignty of the States; [ ] second, a municipality is generally not a business enterprise operating for profit[ ] and there are no stockholders.” Id. at 636 (quotation marks, editorial marks, citations, and footnote omitted). And, third, the “prudential concerns” or “underlying policies” are different: the “policies underlying Chapter 11 are preserving going concerns and maximizing property available to satisfy creditors,” whereas “[t]he policy underlying Chapter 9 is not future profit, but rather continued provision of public services.” Id. (quotation marks, editorial marks, and citations omitted). This is an accurate description of differences, to be sure, but the Bennett opinion never explains why these differences matter, why, based on these differences, would equitable mootness apply in Chapter 11 but not Chapter 9?[9]
*803 The simple answer is that these differences do not matter. The fact that the debtor is a municipality, -with state sovereignty,[10] rather than a business enterprise does not reduce the municipal debtor’s rights in bankruptcy. Actually the opposite is true: “Many of the protections afforded to creditors in the other [bankruptcy] chapters are missing in [Cjhapter 9.” In re City of Desert Hot Springs, 339 F.3d 782, 789 (9th Cir. 2003) (cited in the Bennett opinion). “Chapter 9 provides a [municipal] debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties of the type to which a Chapter 11 debtor is subject.” Id. (quotation marks, editorial marks, and citations omitted). That is, the statutory differences generally favor the Chapter 9 municipal debtor.
Moreover, the fact that a municipality does not operate for profit, have shareholders, or risk- liquidation (factors warranting a plan’s “maximizing property available to satisfy creditors” upon liquidation) does not mean that a municipality has any less interest in finality or good faith reliance on the effectuation of its bankruptcy plan. In this case, the City of Detroit not only had numerous stakeholders and employees—on a scale equivalent to even a very large business enterprise— it also had over 100,000 creditors and 685,-000 residents relying on its Plan. As the district court put it: “If the interests of finality and reliance are paramount to a Chapter 11 private business entity with investors, shareholders, ahd employees, [thus justifying equitable mootness,] then these interests surely apply with greater force to the City’s Chapter 9 Plan, which affects thousands of creditors and residents.” In re City of Detroit, 2015 WL 5697702 at *5.
On appeal, the appellants attempt to complete Bennett’s reasoning as to why, based on the differences between Chapter 11 and Chapter 9, equitable mootness should apply in Chapter 11 but not Chapter 9. They have three basic theories. In one, they argue that the purpose of equitable mootness is to protect a business in Chapter 11 reorganization from the “catastrophic consequence” of compelled liquidation and, because liquidation is not an option in Chapter 9, equitable mootness does not apply in Chapter 9. This is not persuasive. We do not agree that protection against liquidation is the sole purpose of equitable mootness, or even a necessary purpose. Rather, the dual purposes most commonly attributed to equitable mootness are to achieve finality in bankruptcy proceedings and to protect the good faith reliance interests created by . implementation of the bankruptcy plan. But as we have already explained, these purposes apply with as much force in Chapter 9 cases—particularly this one—as in Chapter 11, and possibly more.
Their second theory is premised on the fact that “substantial consummation,” the *804 second element of equitable mootness, is a term specifically defined in Chapter 11 for Chapter 11, see 11 U.S.C. § 1101(2),[11] but does not appear in Chapter 9, see 11 U.S.C. §§ 103(f), 103(g), & 901(a). Thus, they argue that, because “substantial consummation” is required for equitable mootness but omitted from Chapter 9, the entire doctrine of equitable mootness is barred from Chapter 9. But equitable mootness is a doctrine outside of the Code entirely, both Chapters 11 and 9. It did not require, at conception, any codified definitions or terms; it did, however, require, as a qualifying element, a conceptual means “to determine the extent to which the plan ha[d] progressed,” In re United Producers, 526 F.3d at 948, and the means chosen is the § 1101(2)' definition of substantial consummation.1 To be sure, the court could have crafted its own definition, adopted one from elsewhere (such as contract or tort law), or even appropriated the § 1101(2) language without citation. Simply put, we cannot agree that the use of a codified definition as an element necessarily places the entire non-Code doctrine within the exclusive confines of that definition’s particular Code chapter. Rather than restrict equitable mootness to Chapter 11, wé would be better served by merely removing the citation to § 1101(2) and allowing the written definition to stand on its own terms. On its own terms, “substantial consummation” applies just as well in Chapter 9 circumstances as it does in Chapter ll.[12]
The third theory on which the appellants proceed- starts with the fact' that, while Chapter 11 empowers the court to modify the plan, Chapter 9 authorizes only the debtor municipality to modify the plan; the court cannot. See 11 U.S.C. §§ 941, 942. From this they argue that a debtor municipality could refuse all but the most extreme modification, one that would necessitate a wholesale rewriting of the plan and detrimentally affect the rights of third parties, thereby satisfying the main equitable mootness element in any Chapter 9 case. But such a refusal would be an act of bad faith, if the claimants were to seek only a “piecemeal revision” of the plan (that would neither disrupt its overall implementation nor- harm the reliance interests springing from it) but the debtor municipality stubbornly and without cause refuses that modification. So this argument is that the municipal debtor could act in bad faith and the court would be powerless to stop it. We are confident that a court would recognize such obvious bad faith misconduct, or the appellant would bring it to the court’s attention, and that the court could capably determine what lesser modification a debtor municipality could enact if so inclined. Moreover, given that equitable mootness is an equitable doctrine, the court would, be obliged to fully consider that bad faith misconduct.
Ultimately, we do not find any of these three theories any more persuasive than Bennett itself, which we do not find compelling in the present circumstances. Considering the foregoing and the reasons *805 stated by the district court, we conclude that equitable mootness applies to Chapter 9 cases just as it applies to Chapter 11. In fact, considering the particular facts of this case, equitable mootness likely applies “with greater force to the City’s Chapter 9 Plan, which affects thousands of creditors and residents,” see In re City of Detroit, 2015 WL 5697702 at *5.
IY.
For the foregoing reasons, we AFFIRM the judgment of the district court.

. The GRS is a separate legal entity; a fiduciary trust acting on behalf of the City to administer the retirement plans. It is a named defendant and appellee, but is not a participant ' in this appeal.

. The district court opinion explains the details of the ASF recoupment process. See In re City of Detroit, No. 14-CV-14872, 2015 WL 5697702, at *2-3 (E.D. Mich. Sept. 29, 2015). It is not necessary to recount that process here, but it does bear mention that it was projected to recover about $190 million, without which the Plan would have required a 13% across-the-board reduction in GRS pensions, rather than the confirmed 4.5% reduction.

. Class 11 claimants cast 8,541 votes; 6,248 (73%) in favor and 2,293 (27%) against. See Ballot Summary Report, In re City of Detroit, No. 13-53846, Docket No. 6179, p. 19, 2014 WL 4425716 (Bankr. E.D. Mich., July 21, 2014),

. The five appeals here came from five separate district court cases and judgments, each with its own docket and case number, but the same judge decided all five and issued consistent opinions that differed only by an appellant’s individualized claim or argument. Unless specifically noted, any difference is immaterial or irrelevant here and we cite only to the opinion from the Ochadleus case, No. 2:14-cv-14872, as representative of all five.

. In those five separate appeals, appellant Ochadleus (15-2194) represented 129 other named appellants; Taubitz (15-2353) represented one other named appellant; and Quinn (15-2337), Darrah (15-2371), and Davis (15-2379) each represented only themselves. For perspective: a total of 8,541 Class 11 claimants voted on the Grand Bargain and Global Retiree Settlement, meaning these 135 appel *798 lants represent about 1.5% of the Class 11 pool.

. A frequent misnomer in the appellants' briefing warrants mention here: despite their misleading headings and attempts at limiting language, many of the appellants’ specific reasons or arguments against extending equitable mootness beyond its established Chapter 11 context and into Chapter 9 are actually arguments against the viability of equitable mootness at all, in any bankruptcy chapter. If we were to accept these arguments as a reason to preclude equitable mootness in Chapter 9, we would correspondingly be accepting izad endorsing) a reason to abolish equitable mootness altogether. But, as we explain in § III.A, that is something we cannot do. We, therefore, decline to address any of these arguments or reasons individually and instead reject them all categorically under the reasoning in § III.A. In § III.B, we address only the arguments that distinguish Chapter 9 from Chapter 11.

. See footnote 6, supra.

. Note that the parameters of these two "votes” are drastically different, in that the vote denied the Ratepayers in Bennett was either a public referendum on the sewer rate increase or a county-wide general election of the responsible public office-holders, whereas the vote here was merely a majority vote on the acceptance or rejection of the Global Retiree Settlement by the bankruptcy’s specific “Class 11 claimant” creditors. .

. The Bennett opinion does explain at length why one difference matters and, ultimately, relies exclusively on that one difference to justify its rejection of equitable mootness; that difference is that municipalities, unlike business enterprises, provide public services and engage in the political process. See Bennett, 518 B.R. at 636-38; at 636 ("the interest of the public in the provision of governmental services”); at 637 ("place substantial future financial obligations on the citizens of Jefferson County without representation”); at 637 ("the County’s ceding of its future authority to set sewer rates to the bankruptcy court ... would not arise in private contracts under a Chapter 11 plan”); at 638 (under the plan, the citizens’ "interest in continuing to receive essential sewer service is not protected by the political system of County governance nor do they have a voice in future rate-making”).
Importantly, that is the very difference discussed in the preceding four paragraphs above, the difference that necessarily distinguishes Bennett from the present case. Because this concern about public services and political process does not arise in every Chapter 9 bankruptcy case—as it clearly does not arise in the present case—it is not a valid reason to conclude that equitable mootness *803 does not apply in any Chapter 9 bankruptcy case.

. Because Bennett’s forceful but aimless language about this sovereignty issue does not articulate why it matters to the applicability of equitable mootness, and therefore could be misread as questioning the constitutionality of municipal bankruptcy itself, see 518 B.R. at 636 ("Chapter 9 places federal law in juxtaposition to the rights of states to create and govern their own subdivisions”), it bears mention that Chapter 9 municipal bankruptcy is cqnstitutional. See United States v. Bekins, 304 U.S. 27, 51, 58. S.Ct. 811, 82 L.Ed. 1137 (1938); see also Franklin Calif. Tax-Free Trust v. Puerto Rico, 805 F.3d 322, 327 (1st Cir. 2015) (affirmed, 579 U.S. —-, 136 S.Ct. 1938, 195 L.Ed.2d 298 (2016)); In re City of Detroit, 504 B.R. 97, 136-54 (Bankr. E.D. Mich. 2013) (analyzing the constitutionality of Chapter 9 in this case).

. This provision' says: "In this chapter [Chapter 11] ... ‘substantial consummation’ means—(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

. Another way of looking at this is to recognize, as the appellants themselves have in their briefs, that Congress intended § 1101(2) to apply to specific Code provisions establishing cause for conversion or dismissal, • § 1112(b)(4)(M), - and limiting the time for ' plan modification, § 1127(b), not to equitable ■mootness.