[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11690
_____

D.C. Docket No. 2:14-cv-00213-SLB,
Bkcy No. 11-bkc-05736-TBB9


ANDREW BENNETT,
Jefferson County Tax Assessor, Bessemer Division,
RODERICK V. ROYAL,
Former Birmingham City Council President,
MARY MOORE,
Alabama State Legislator,
JOHN W. ROGERS,
Alabama State Legislator,
WILLIAM R. MUHAMMAD, et al.,

                                        Plaintiffs - Appellees,

versus

JEFFERSON COUNTY, ALABAMA,

                                        Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(August 16, 2018)

Before TJOFLAT, MARTIN, and JORDAN, Circuit Judges.

JORDAN, Circuit Judge:

Generally speaking, the doctrine of equitable mootness "permits courts sitting in bankruptcy appeals to dismiss challenges (typically to confirmation plans) when effective relief would be impossible." *Ullrich v. Welt (In re Nica Holdings, Inc.)*, 810 F.3d 781, 786 (11th Cir. 2015). We have applied the doctrine in the Chapter 11 reorganization context, *see, e.g., First Union Real Estate Equity & Mortg. Invs. v. Club Assocs. (In re Club Assocs.)*, 956 F.2d 1065, 1067–71 (11th Cir. 1992), and in Chapter 13 cases, *see, e.g., Hope v. Gen. Fin. Corp. of Ga. (In re Kahihikolo)*, 807 F.2d 1540, 1543 (11th Cir. 1987), and we have assumed without deciding that it applies in Chapter 7 cases, *see Nica Holdings*, 810 F.3d at 786 n.4, but until today we have not been asked to apply the doctrine in a Chapter 9 municipal bankruptcy case.

# I

Municipal bankruptcy proceedings are usually complicated affairs, and the Chapter 9 proceeding for Jefferson County, Alabama—involving about $3.2 billion in total sewer-related debt—has proved to be no different. A detailed chronology can be found in *Bennett v. Jefferson County*, 518 B.R. 613, 616–26 (N.D. Ala. 2014), and *In re Jefferson County*, 474 B.R. 228, 236–45 (Bankr. N.D. Ala. 2012), but the relevant facts and procedural history are set forth below.

2

**A**

Jefferson County filed for bankruptcy in November of 2011. In June of 2013, following 18 months of negotiations, the County announced that it had come to an agreement in principle with almost all of its major creditors.

The final settlement, reached in November of 2013, provided that the County would issue and sell in public markets new sewer warrants (through an indenture) in the amount of approximately $1.785 billion, with the proceeds and other funds being used to redeem and retire the prior sewer warrants (which, again, totaled about $3.2 billion) at a reduced and compromised amount of about $1.8 billion.

Pursuant to the settlement, the County would cut over $100 million in general fund expenditures, the creditors would write off a significant amount in outstanding debt, and the County (or the bankruptcy court if the County failed to act) would implement a series of single-digit-percent sewer rate increases over 40 years. The County would not be able to decrease sewer rates in a given fiscal year unless it could somehow offset the decrease (by, for example, increasing its customer base). Over the course of these 40 years—the planned time period for retiring the new sewer warrants—sewer rates would increase about 365%, which is not far off of the national increase in inflation in the previous 40 years. With respect to non-sewer debt, warrants would be repaid in full on terms favorable to

3

the County through the exchange of existing general obligation warrants and school warrants for new warrants. *See Bennett*, 518 B.R. at 623–25.

At the confirmation hearing before the bankruptcy court on November 21, 2013, a group of Jefferson County ratepayers objected to the County's proposed plan. They argued that the plan validated corrupt government activity (e.g., bribery) that procured the execution of some of the prior sewer warrants and led to the debt crisis; that the plan, by taking the ability to set rates out of the hands of elected Jefferson County commissioners, infringed on their rights to vote and to be free from overly burdensome debt without due process; and that the plan was not feasible because it was imposed over a service area with a declining population and falling income levels, and because it increased costs for a long period of time without any consideration of the users' ability to pay. *See id.* at 626. One of the claims asserted by the ratepayers was that certain of the prior sewer warrants were invalid because they violated provisions of the Alabama Constitution and the United States Constitution. *See id.* at 626–27.

The bankruptcy court entered a confirmation order over the ratepayers' objections on November 22, 2013, the day following the hearing. The order in part dismissed pending claims, and barred any and all persons from commencing or continuing any action to assert the claims made by the ratepayers prior to the start of, or in, the Chapter 9 bankruptcy proceeding.

4

In the confirmation order, the bankruptcy court retained jurisdiction for the 40-year life of the new sewer warrants to, among other things, adjudicate controversies regarding the validity of actions taken pursuant to the plan, including implementation or enforcement of the approved rate structure and issuance of the new sewer warrants, and enter any necessary or appropriate orders or relief (including mandamus).  *See* Bankr. D.E. 2248 at 67–68.  The disclosure statement for the indenture contained similar language describing the bankruptcy court's retention of jurisdiction.

The plan's effective date was December 3, 2013.  Although Bankruptcy Rule 3020(e) normally imposes an automatic 14-day stay on the operation of a confirmation order, at the confirmation hearing the ratepayers did not object to the County's motion (filed two weeks earlier) to waive the automatic stay.  In the absence of an objection, the bankruptcy court exercised its discretion under Rule 3020(e) to waive the automatic stay when it entered the confirmation order.  *See Bennett*, 518 B.R. at 626.

The ratepayers filed their notice of appeal on December 1, 2013, two days prior to the plan's effective date.  But they did not ask the bankruptcy court, or the district court, for a stay of the confirmation order pending appeal.  Nor did they request that their appeal be expedited.  On December 3, 2013, pursuant to the terms of the order, the County issued the new sewer warrants.  The proceeds from the

5

sale of these warrants went in part towards retiring the prior sewer warrants, with more than $1.454 billion going into a clearinghouse system to pay individual and institutional investors.  *See id.*

## B

In the district court, the County moved to dismiss the ratepayers' appeal, arguing in relevant part that any challenges to the confirmation order were constitutionally, statutorily, and equitably moot because the plan had been consummated and the transactions that were completed could not be unwound. The ratepayers responded that their appeal was not moot because, among other things, the bankruptcy court could not constitutionally retain jurisdiction to conform (if necessary) sewer rates to the plan over a 40-year period.  In the ratepayers' view, such rates had to be set in compliance with Alabama law.  As the district court explained, the ratepayers wanted to "avoid . . . paying rates set by a [County] Commission wh[ich] can be taken to the bankruptcy court if it enacts rates in violation of" the approved rate structure.  *Bennett*, 518 B.R. at 631 n.21. The district court rejected each of the County's mootness arguments.

First, the district court concluded that the appeal was not moot under Article III.  Although the consummation of the plan might limit the scope of relief available to the ratepayers, the court concluded that it could fashion "'*some* form

6

of meaningful relief.'"  *See id.* at 631 (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).

Second, there was no "statutory mootness" under 11 U.S.C. § 364(e).  Under Eleventh Circuit precedent, said the district court, § 364(e) protects "only transactions authorized by § 364(c) or (d)," and it did not believe that the issuance of the new sewer warrants to pay off the prior sewer warrants was a transaction authorized by § 364(c) or (d).  *Id.* at 632.  *See also id.* at 633 ("Neither subsection (c) nor subsection (d) authorizes the bankruptcy court to allow the County to obtain credit or incur debt by giving the lender or the bankruptcy court unlawful or unconstitutional ratemaking authority.").

Third, the district court ruled that the appeal was not equitably moot despite the failure of the ratepayers to seek, let alone obtain, a stay of the confirmation order.  The court thought that the doctrine of equitable mootness, which is prudential in nature, was in some tension with the Supreme Court's reaffirmation of the principle that federal courts have a "virtually unflagging" obligation to hear and decides cases within their jurisdiction.  *See id.* at 634.  But it did not need to confront those potential concerns because it held that equitable mootness does not apply to constitutional challenges to a confirmation order in a Chapter 9 proceeding: "In the case of a Chapter 9 reorganization plan[,] finality and reliance may be required to yield to the Constitution and the interests of the public in the

7

provision of governmental services." *Id.* at 636.  And "applying the doctrine of equitable mootness as the County espouse[d] would prevent *both* state and federal Article III courts from deciding . . . 'knotty state law' and constitutional issues and would prevent any review of a federal bankruptcy court's assumption of jurisdiction to enforce its unreviewed actions." *Id.* at 637.  Although the court recognized that "some part or parts" of the confirmation order might be "impossible to reverse," the "County's ceding of its future authority to set sewer rates to the bankruptcy court" as a term of the new sewer warrants was "not one of those parts." *Id.*  If it agreed with the ratepayers that the bankruptcy court's retention of jurisdiction was unconstitutional, the court could declare that provision invalid and prevent its enforcement. *See id.*

Finally, the district court explained that, even if the doctrine of equitable mootness applied in Chapter 9 bankruptcy proceedings, it would nevertheless deny the County's motion to dismiss.  The court could, as it had noted, grant the ratepayers some relief by striking the terms providing for the bankruptcy court's retention of jurisdiction and authority to set sewer rates in the future.  Moreover, the ratepayers' failure to obtain a stay, though significant in the equitable mootness analysis, was not dispositive.  There had been a rush to consummation, and seeking a stay "was futile and cost-prohibitive." *Id.* at 639.  No stay, reasoned the court, would have been granted. *See id.*

8

The district court later certified its ruling for interlocutory review, and Jefferson County instituted the present appeal. We conclude that the case is not constitutionally moot, but hold that it is equitably moot, and therefore reverse and remand for dismissal of the ratepayers' appeal from the bankruptcy court's confirmation order. We do not reach statutory mootness as a separate issue, but touch on it briefly in discussing equitable mootness.

## II

We first address Article III mootness—i.e., mootness in the jurisdictional and constitutional sense. This doctrine, the Supreme Court has held, emanates from the "case or controversy" requirement of Article III. *See, e.g., Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).[1]

"[T]he party who alleges that a controversy before us has become moot has the 'heavy burden' of establishing that we lack jurisdiction." *Michigan v. Long*, 463 U.S. 1032, 1042 n.8 (1983). *See also Mattern v. Sec'y for the Dep't of Corr.*, 494 F.3d 1282, 1285 (11th Cir. 2007); *Dupree v. Palmer*, 284 F.3d 1234, 1237 (11th Cir. 2002). The district court held that the ratepayers' appeal is not constitutionally moot. Exercising plenary review, *see Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1331 (11th Cir. 2005), we agree.

---

[1] Not all members of the Supreme Court have agreed with the Article III characterization of mootness. *See Honig v. Doe*, 484 U.S. 305, 331 (1988) (Rehnquist, C.J., concurring) (asserting that any connection between a court's "unwillingness to decide moot cases" and "the case or controversy requirement of Art. III" is "attenuated").

9

The County's argument is essentially that we (and the district court) lack the legal authority to issue the relief that the ratepayers seek. *See* County's Opening Br. at 28 ("[T]he dispositive question is . . . whether a reviewing court can provide meaningful relief if it agrees with the [party challenging the bankruptcy court's order] that the order is erroneous"). "But that argument—which goes to the meaning of the [bankruptcy laws] and the legal availability of a certain kind of relief—confuses mootness with the merits." *Chafin v. Chafin*, 568 U.S. 165, 174 (2013). *Cf. Moody v. Warden*, 887 F.3d 1281, 1285–87, 1292 (11th Cir. 2018) (holding that death row inmate had Article III standing to challenge his planned execution notwithstanding the court's ultimate conclusion that he could not obtain legal relief). We note also that, in the one case that we have found in which the Supreme Court addressed mootness in the context of action taken in reliance on an unstayed order in a bankruptcy proceeding, the Court had no trouble concluding that the case presented a justiciable controversy. *See Wayne United Gas Co. v. Owens-Ill. Glass Co.*, 300 U.S. 131, 134–35 (1937).

Notably, the County does *not* contend—as the respondent did in *Chafin*—that any of the forms of relief sought here (e.g., striking the offending jurisdictional provision from the confirmed plan) would be "ineffectual" with respect to the ratepayers' harm. *See Chafin*, 568 U.S. at 174–76; *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224 n.3 (2013). Nor does it contend that any "law of

10

physics prevents" us from issuing relief that might provide some relief for the ratepayers in this case. *Chafin*, 568 U.S. at 175. *Cf. Rhodes v. Stewart*, 488 U.S. 1, 4 (1988) (discussing mootness where a plaintiff seeking injunctive relief has died).

In sum, we have a live case under Article III. We proceed to consider the parties' arguments about another sort of "mootness."

## III

We review de novo the district court's conclusion that the doctrine of equitable mootness does not apply in the Chapter 9 context. The same standard of review applies to the district court's alternative ruling that, if the doctrine did generally apply, it would not bar the ratepayers' appeal. *See In re Club Assocs.*, 956 F.2d at 1069.[2]

The County argues that the doctrine of equitable mootness bars the ratepayers' appeal from the bankruptcy court, and that the district court erred in concluding otherwise. We agree. First, we explore what precisely the doctrine is. Second, we explain why the doctrine can apply in a Chapter 9 proceeding like this

---

[2] We recognize that some other circuits review the application of the equitable mootness doctrine under an abuse of discretion standard. *See, e.g., R$^2$ Investments, LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 483 (2d Cir. 2012) (acknowledging a circuit split). If we were writing on a clean slate, we might well use that deferential standard given the equitable and prudential foundations of the doctrine. But we applied a de novo standard in *In re Club Assocs.*, and as a panel we are bound by that earlier ruling.

11

one.  Finally, we conclude that the doctrine bars the ratepayers' appeal from the bankruptcy court's confirmation order.

## A

The doctrine of equitable mootness appears to have emerged at least a few decades ago in the various federal courts of appeals.  *See, e.g., Am. Grain Ass'n v. Lee-Vac, Ltd.*, 630 F.2d 245, 247–48 (5th Cir. 1980); *Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 796–98 (9th Cir. 1981); *In re Cont'l Airlines*, 91 F.3d 553, 557–67 (3d Cir. 1996) (en banc); Ross Elgart, *Bankruptcy Appeals and Equitable Mootness*, 19 Cardozo L. Rev. 2311, 2323–27 (1998).  As far as we can tell, the Supreme Court has never endorsed it.  Nor, however, has the Supreme Court, nor any court of appeals, rejected the concept outright.  *See Ochadleus v. City of Detroit (In re City of Detroit)*, 838 F.3d 792, 800 (6th Cir. 2016) (2–1 decision applying equitable mootness in the context of a Chapter 9 municipal bankruptcy and noting that "even if the Supreme Court would abolish equitable mootness, it has not yet done so (nor has any circuit)").  *Cf. Wayne United Gas Co.*, 300 U.S. 131, 133–35 (denying an attempt to dismiss a bankruptcy appeal as moot due to the sale of the debtor's property in a separate state-court proceeding, because the creditors proceeded in state court "with full knowledge" that the debtor was simultaneously seeking reconsideration of the order dismissing its bankruptcy petition).

12

Essentially, this doctrine provides that reviewing courts will, under certain circumstances, reject bankruptcy appeals if rulings have gone into effect and would be extremely burdensome, especially to non-parties, to undo.  The use of the word mootness (and the invocation of the consequences that arise from a mootness finding) in the term equitable mootness is a legal fiction, akin to the use of the word "eviction" (and the analogous invocation of relevant consequences) in the term "constructive eviction."  *See, e.g., Detroit*, 838 F.3d at 798 ("Equitable mootness is not technically 'mootness'—constitutional or otherwise—but is instead 'a prudential doctrine . . . '"); *id.* at 806 (Moore, J., dissenting) ("Despite the name, equitable mootness bears no relation to 'mootness.'  Indeed, in an equitably moot appeal, the relief sought is the opposite of moot—the consequences of granting it would be so great that they are deemed inequitable.").

The doctrine, then, does not reference actual mootness at all.  As the leading bankruptcy treatises explain, its application turns on equitable and prudential concerns which focus on whether it is reasonable to entertain the contentions of the parties challenging an order of the bankruptcy court. *See* William L. Norton, Jr. & William L. Norton III, 8 Norton Bankr. Law & Practice § 170:87 (3d ed. 2018); 7 Collier on Bankruptcy ¶ 1129.09[1] & n.2 (16th ed. 2018).  It would perhaps be more appropriate for us to file the doctrine under the rubrics of forfeiture, waiver, or laches. *See In re One2One Commc'ns, LLC*, 805 F.3d 428, 449–50 (3d Cir.

13

2015) (Krause, J., concurring) (noting that "there are effective alternatives that do not suffer from the prudential, statutory, and constitutional defects of equitable mootness," including "the equitable defense of laches"). *Cf. N. Pac. Ry. Co. v. Boyd*, 228 U.S. 482, 508–10 (1913) (explaining that in some scenarios—such as when harm results to others—laches may prevent a delayed challenge by a creditor to a foreclosure sale of the debtor's assets). But it seems too late to change the nomenclature now.

## B

Given that we are being asked to apply equitable mootness in a new setting, it makes sense to take a step back and consider the doctrine's origins. By the mid-1990s, most federal circuits had applied a version of the doctrine, and some had even referred to it as "equitable mootness." *See generally Cont'l Airlines*, 91 F.3d at 558 (citing cases from the First, Second, Fourth, Fifth, Seventh, Ninth, Eleventh, and D.C. Circuits).

For our part, we have used variations of the term equitable mootness (including "equitably moot") in three published opinions involving bankruptcy appeals: *Florida Agency for Health Care Administration v. Bayou Shores SNF, LLC (In re Bayou Shores SNF, LLC)*, 828 F.3d 1297, 1328 (11th Cir. 2016); *Nica Holdings*, 810 F.3d at 786; and *Alabama Department of Economic & Community Affairs v. Ball Healthcare–Dallas, LLC (In re Lett)*, 632 F.3d 1216, 1225 (11th Cir.

2011). In each of these cases, we held that the doctrine did not apply in the particular circumstances presented. But it would be incorrect to say that we have never endorsed or applied the doctrine, because in these three cases we relied on earlier decisions in which we *had* dismissed bankruptcy appeals as "moot" (simpliciter) while overtly relying on equitable considerations. *See, e.g., Club Assocs.*, 956 F.2d at 1069 ("The test for mootness reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him.").[3]

Over the years, we have identified a number of important considerations for deciding whether the doctrine bars an appeal. The facts will weigh in favor of finding equitable mootness when allowing an appeal to go forward will impinge upon actions taken to one's detriment in "good faith reliance on a [final and unstayed] judgment." *Id.* at 1069–70. *Cf. Doll v. Grand Union Co.*, 925 F.2d 1363, 1371 (11th Cir. 1991) (discussing the equitable defense of promissory estoppel). Or—all the more—when permitting an appeal will interfere with actions taken without knowledge that any claims are still pending final resolution.

---

[3] For other Eleventh Circuit cases holding that bankruptcy appeals were barred by equitable and prudential considerations, see *Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1553 (11th Cir. 1988); *Gwinnett Bank & Trust Co. v. Matos (In re Matos)*, 790 F.2d 864, 865–66 (11th Cir. 1986); and *Kahihikolo*, 807 F.2d at 1543.

15

*See, e.g., Markstein v. Massey Assocs., Ltd.*, 763 F.2d 1325, 1327 (11th Cir. 1985) (holding that foreclosure sale of disputed property to a non-party would not be voided, but remanding for consideration of claim regarding repayment of funds wrongly held by the original creditor). The more substantially the party aggrieved by a judgment has allowed the egg of that judgment to be scrambled—the more that people have acted in ways that render inequitable the relief sought by the aggrieved party—the less likely we will be willing to consider ordering anyone to countenance "the pains that attend any effort to unscramble an egg." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). *See also Bayou Shores*, 828 F.3d at 1328 ("The equitable mootness doctrine seeks to avoid an appellate decision that 'would knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the [b]ankruptcy [c]ourt.'"). The more complex a transaction (or a series of transactions) is, and the longer the time that has passed since the confirmation of the plan, the harder it will be to undo the past.

Conversely, if the relief sought does not undermine actions that may have been taken in reliance on the judgment, or if no such actions have been taken, then there will be no reason to conclude that an appeal is equitably moot. *See, e.g., Russo v. Seidler (In re Seidler)*, 44 F.3d 945, 949 (11th Cir. 1995) (matter was not equitably moot because the debtor had not yet recorded satisfaction of putative

16

creditor's lien that bankruptcy court concluded had been satisfied and had not sold the home); *Markstein*, 763 F.2d at 1327 & n.1, n.2 (dismissing appeal insofar as it challenged the validity of the foreclosure sale of the debtor's asset, but remanding because, "if the [debtor's] property sold at foreclosure for an amount in excess of the mortgage debt[,] the excess [might] go into the debtor's estate").

We are sensitive to the "interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him."  *Club Assocs.*, 956 F.2d at 1069.  Consequently, courts will be less likely to find an appeal equitably moot if the aggrieved party sought a stay (especially if it did so promptly), if a stay was unjustifiably denied or was justifiably not requested, or if appellate review was sought reasonably promptly.  *Compare Nica Holdings*, 810 F.3d at 787 (addressing appeal on the merits where the bankruptcy court rejected one motion to stay as too early and, immediately afterward, another one as too late, so that "there was never a time when [the appellant] *could* file a motion to stay"), *with Club Assocs.*, 956 F.2d at 1070–71 (dismissing appeal and endorsing the bankruptcy court's conclusion that the aggrieved party's failure to immediately seek a stay was "deliberate"). Other equitable considerations may also weigh against concluding that an appeal is "equitably moot," as we observe below in weighing the circumstances here.  *See, e.g., Dill Oil Co., LLC v. Stephens (In re Stephens)*, 704 F.3d 1279, 1283 (10th Cir. 2013).

17

We have said that equitable mootness is rooted in the "general [principles] of appellate procedure." *Lee-Vac*, 630 F.2d at 248. To be sure, Congress has codified one part or another of the doctrine at certain points in time. *See, e.g., id*. at 247–48 (former Bankruptcy Rule 805); *UNR*, 20 F.3d at 769 (enumerating "[s]everal [statutory] provisions . . . provid[ing] that courts should keep their hands off consummated transactions"). But we have since rejected attempts to strictly read any such codifications. *See Lee-Vac*, 630 F.2d at 247–48. And we have not inferred too much from the removal of any such codifications from the Bankruptcy Code. *See UNR*, 20 F.3d at 769 ("Section 1127(b), unlike § 363(m), does not place any limit on the power of the court of appeals, but the reasons underlying §§ 363(m) and 1127(b)—preserving interests bought and paid for in reliance on judicial decisions, and avoiding the pains that attend any effort to unscramble an egg—are so plain and so compelling that courts fill the interstices of the Code with the same approach."); *Miami Ctr.*, 838 F.2d at 1553 ("The Eleventh Circuit, like other circuits, has recognized the continuing viability and applicability of the mootness standard in situations other than transfers by a trustee under § 363(b) or (c).") (citing cases); *Sewanee Land, Coal & Cattle, Inc. v. Lamb (In re Sewanee Land, Coal & Cattle, Inc.)*, 735 F.2d 1294, 1296 (11th Cir. 1984) (explaining that the absence of an equivalent to Rule 805 in new bankruptcy rules did not call for a different outcome under the new rules, and holding that an appeal of the sale of

18

real property was equitably moot because the court was "powerless to grant relief").[4]

## C

We have never addressed whether equitable mootness applies in the Chapter 9 context. Because the doctrine is driven by its principles rather than any particular codification or arbitrary limitation, *see Lee-Vac*, 630 F.2d at 247–48, and because we see no respect in which these principles are bound to come into play any less in the Chapter 9 context than in the contexts of Chapters 11 or 13, we see no reason to reject the doctrine here. Indeed, in ways these principles will sometimes weigh more heavily in the Chapter 9 context precisely because of how many people will be affected by municipal bankruptcies. "'If the interests of finality and reliance are paramount to [analysis of equitable mootness for] a Chapter 11 private business entity with investors, shareholders, and employees, . . . then these interests surely apply with greater force to the [County's] Chapter 9 Plan, which affects thousands of creditors and residents.'" *Detroit*, 838 F.3d at 803. Nor do we see any reason why the doctrine's principles would not be self-cabining in this context as they are in other bankruptcy contexts. We therefore join

---

[4] We have, in this respect, perhaps differed somewhat from some other circuits, which have varied in how much they have focused on statutory provisions or rules in interpreting the doctrine. *See, e.g., Detroit,* 838 F.3d at 807–08 (Moore, J., dissenting) (discussing development of the doctrine in several circuits); *Castaic Partners II, LLC v. Daca–Castaic, LLC (In re Castaic Partners II, LLC)*, 823 F.3d 966, 968 (9th Cir. 2016) ("statutory mootness codifies part, but not all, of the doctrine of equitable mootness").

the two other courts that have addressed this question in concluding that equitable mootness can apply in Chapter 9 cases. *See id.* at 804–05 (2–1 decision); *Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*, 542 B.R. 261, 274 (B.A.P. 9th Cir. 2015) (citing an earlier Ninth Circuit case, *Lionel v. City of Vallejo (In re City of Vallejo)*, 551 F. App'x 339 (9th Cir. 2013), which reached the same result but did not indicate that the question was disputed).

The district court concluded that Chapter 9 is different in ways that required it to hold that equitable mootness does not apply in this context. The ratepayers, defending the district court's decision, contend that the doctrine has no role in municipal bankruptcies because Chapter 9 "implicates public concerns" and potentially involves constitutional issues (like the ones they are asserting). *See* Appellees' Br. at 4. These are important points, and we have duly considered them. Nevertheless, we are still persuaded that equitable mootness can apply in Chapter 9 cases.

The main theme running through the district court's reasoning, and the ratepayers' arguments, is that municipalities and their bankruptcies implicate issues of sovereignty, whereas corporations or individuals and their bankruptcies do not—and that, accordingly, it is important for us to tread carefully where self governance is concerned. *See Bennett*, 518 B.R. at 636–38. In a certain sense this observation rings true: the Bankruptcy Code arguably gives more (but certainly

20

different) protection to government entities under Chapter 9 than to private persons and entities who seek bankruptcy protection.  *See Detroit*, 838 F.3d at 803.

But this argument doesn't speak to the threshold question of whether equitable mootness *can* apply in *any* case—it only speaks to whether it applies in particular cases.  We see no reason why, for example, if a run-of-the-mill creditor of a municipality (which would have no greater basis in a Chapter 9 case than in any other bankruptcy case for laying claim to any equities of constitutional proportion) objects to a Chapter 9 bankruptcy plan, that creditor should be able to avoid equitable mootness merely because the bankruptcy proceedings happen to be under Chapter 9.  Just as in other kinds of bankruptcy proceedings, concerns about finality, reliance, and equity will be at play.

In addition, it is not at all clear in which direction the ratepayers' federalism arguments will cut from one Chapter 9 bankruptcy to the next.  Given the interests of the municipality and those of its residents (among others), there is a countervailing argument that a court ought to be *more* solicitous to the municipality that has obtained confirmation of its plan and thus be *especially inclined* to pull the trigger of equitable mootness.  In the present case, the ratepayers (to whom a state's or municipality's rights ultimately accrue) are challenging the confirmed bankruptcy plan's alleged trampling of their state-based

rights, but what about the actual state entity (for whose sovereignty Chapter 9 procedures reflect such concern)?

Finally, we recognize that, given the centrality of constitutional rights to the fabric of our republic, there is a fair argument to be made that we should allow some leniency when a party who has allowed a bankruptcy plan to go into effect asserts constitutional claims on appeal. But the mere fact that a potential or actual violation of a constitutional right exists does not generally excuse a party's failure to comply with procedural rules for assertion of the right. A "constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Henderson v. United States*, 568 U.S. 266, 271 (2013) (internal quotation marks omitted). And we generally allow those with constitutional rights to waive them. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944–45 (2015) (permitting litigants to consent to disposition by the bankruptcy court of claims that would have otherwise required an Article III tribunal for adjudication).

Ultimately, we think the correct result is to join the Sixth Circuit and the Ninth Circuit B.A.P. in allowing equitable mootness to apply in the Chapter 9 context. As for federalism concerns, it will be appropriate to note them when

22

deciding whether the doctrine should bar an appeal in a particular bankruptcy case. We do precisely this below.

## D

Having explained the law that underpins our equitable mootness inquiry, and having concluded that the doctrine can apply in a Chapter 9 case such as this, we now explain why equitable mootness bars the ratepayers' appeal.

First, and critically, the ratepayers here have never asked any court to stay the implementation of the plan that the bankruptcy court confirmed—not the bankruptcy court itself, not the district court, and not this court—and consequently no court has ever stayed the implementation of the plan. Indeed, the ratepayers had the opportunity to defend the automatic 14-day stay when Jefferson County asked the bankruptcy court to waive it, but they raised no objection then either. Nor did the ratepayers ever ask that their appeal be expedited. Consequently, when Jefferson County commenced this appeal, the bankruptcy court's confirmation order (and the plan) had been in effect, never having been stayed, for more than a year.

We acknowledge that the "failure to obtain a stay does not necessarily preclude review of [an] appeal." *Club Assocs.*, 956 F.2d at 1070. For example, if the relief sought on appeal does not seriously undermine the actions that parties have taken in good faith reliance on the judgment, or with no knowledge at all of

23

the pending litigation, then there may be no reason to conclude that the appeal is equitably moot. *See, e.g., Seidler*, 44 F.3d at 949 (party which prevailed before the bankruptcy court in dispute over title to home retained the property in question, so the dispute was not equitably moot). We may also be less concerned that a stay was not granted if, for example, a court appears to have refused a stay on inappropriate grounds. *See Nica Holdings*, 810 F.3d at 787.

Claiming this "not necessarily preclude[d]" rubric for themselves, the ratepayers contend (and the district court held) that seeking a stay would have been futile because the ratepayers could never have raised sufficient money to post a supersedeas bond for a plan confirmation with billions of dollars at stake. *See Bennett*, 518 B.R. at 639–40. We see things differently. For starters, even if the bankruptcy court (which had confirmed the plan over the ratepayers' objections) had been inclined to deny a stay, the same certainly could not be said of the district court (which has agreed with the ratepayers on at least some of their arguments). On this record, we do not think it can fairly be said that seeking a stay and/or requesting that the appeal be expedited were fool's errands. We come to this conclusion in part by rejecting a premise of the ratepayers' argument: that a bond would necessarily have been required for a stay of limited duration. Given the unique nature of a Chapter 9 proceeding, the ratepayers could have asked for limited stay relief on another basis, such as meeting the traditional requirements for

24

obtaining a preliminary injunction—likelihood of success on the merits, irreparable harm, etc. *Cf. Ind. State Police Pension Trust v. Chrysler LLC*, 556 U.S. 960, 960 (2009) (endorsing the application of these factors in deciding whether to stay a bankruptcy court order authorizing the sale of assets); *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979) (discussing alternatives to posting an appeal bond for the full amount of the judgment).

Second, and closely related to the stay question, the County and others have taken significant and largely irreversible steps in reliance on the unstayed plan confirmed by the bankruptcy court. Specifically, the County has issued over one billion dollars' worth of new sewer warrants and has used the proceeds to retire the old sewer warrants. These new warrants were sold based on a commitment— backed up by an unstayed court order—to set sewer rates at particular amounts over the course of the next 40 years. The relief sought here, even if limited to striking the provision giving the bankruptcy court jurisdiction with respect to future rates, would seriously undermine actions taken in reliance on the confirmation order. If the district court were to excise the part of the plan providing the bankruptcy court with jurisdiction to oversee disputes regarding the required future increases in sewer rates, there would be serious uncertainty about what would happen to the value of the new warrants, released into the market in

25

the absence of a stay of the confirmation order. We think it is fair to assume that, at the very least, whoever ultimately held those warrants would be adversely affected. Were we to do more, as the County insists that we would be required to do, and vacate the confirmation order *in toto*, any concern about the value of these warrants would pale in comparison to the ill effects not just to investors, but to the County and, ultimately, its residents.

This case is, consequently, much like others in which we have refused to allow a party fully to air the merits of its appeal because granting the relief sought would be inequitable or practically impossible. *See, e.g., Club Assocs*., 956 F.2d at 1069–71 (lender's appeal of plan reorganizing real estate entity was moot where other parties had stepped in and made investments to revitalize the entity in reliance on the confirmed plan); *Matos*, 790 F.2d at 865–66 (debtor's appeal of plan that allowed foreclosure sale of the debtor's home was moot where the mortgage lender had conducted foreclosure sale in reliance on the confirmed plan, even though the lender itself bought the home in the sale). And it is quite unlike the few in which we have considered applying equitable mootness but decided, notwithstanding an unstayed judgment, that the doctrine did not apply. These disputes have typically involved the allocation of money, and have not had any bearing on the rights of non-parties or (other) creditors, nor on the continued

26

viability of an entity rehabilitated through the bankruptcy process.  *See, e.g., Seidler*, 44 F.3d at 949; *Markstein*, 763 F.2d at 1327.

Finally, as with many equitable determinations based on notions of fairness, we look briefly at the merits and the public interest to determine whether or to what extent a decision either way in this case might result in injustice.  *See In re Club Assocs.*, 956 F.2d at 1071 ("The concept of mootness is based upon the premise that a court will undertake the task of carefully examining each issue presented on appeal.").  *See also Stephens*, 704 F.3d at 1283 ("Because of the private and public interest in resolving this legal issue, we decline to apply the doctrine of equitable mootness.").  As we noted above, concern for the merits is especially warranted where, as here, the challenged plan is alleged to impinge on municipal sovereignty.  Here, however, we see no such injustice.

The core of the ratepayers' arguments is that, through the plan, the bankruptcy court has allowed County commissioners at one point in time to bind future County commissioners—indeed, the County as a whole—in a way that impermissibly reduces the autonomy of the County and the political voice of the voters of Jefferson County (including the ratepayers).  This argument is, in our view, not very strong.

Courts are sympathetic to concerns about end-runs around political processes, *see, e.g., INS v. Chadha*, 462 U.S. 919, 959 (1983), and the ratepayers

27

have a point that constraining future budgetary decisions in this manner in a sense bypasses the usual procedures. In effect, the County has bound itself to raise rates for decades according to a particular schedule, with limited exceptions/safety valves. But the ratepayers are incorrect in claiming that this constitutes a fundamental change to the way that a municipality governs.

Elected officials can bind their successors—and consequently also their constituents, the people—to all kinds of unavoidably long-lasting financial effects, sometimes irreversibly: they spend budget surpluses; they run deficits; they raise and cut taxes; they expand and contract boundaries; they sign long-term contracts; and they enter into expensive consent decrees to resolve litigation. We know of no authority for the proposition that such government action, which impinges on the rights (or at least limits the ability) of future governments to undo, becomes an illegal end-run around constitutional governance. That a Chapter 9 bankruptcy plan subjects the residents of Jefferson County to rate increases over time, instead of forcing them to bear the financial pain all at once, does not transmogrify it into one that per se violates the ratepayers' constitutional rights. *Cf. Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1277 (11th Cir. 2017) ("the greater power normally includes the lesser"). We need not attempt to engage in subtle line-drawing exercises between permissible and impermissible commitments to future action in this appeal, because the ratepayers have not asked us to do so. They seek

28

only a per se bar on such future commitments by their elected representatives in accordance with the plan. Having evaluated the factors relevant to an equitable mootness determination, we conclude that dismissing the ratepayers' appeal is appropriate.

We note, in concluding, that no party has so far asked the bankruptcy court to exercise its jurisdiction to force Jefferson County to adjust its sewer rates according to the provisions of the confirmed plan. We therefore express no view on whether the ratepayers (or anyone else) will be able to mount a challenge to aspects of the plan in the future should the bankruptcy court in fact purport to exercise its jurisdiction to compel an increase in rates in compliance with the plan.

## IV

We reverse the order of the district court and remand for dismissal of the ratepayers' appeal from the plan confirmed by the bankruptcy court.

**REVERSED and REMANDED.**

29