[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-14050

_____

In re: LORENZO ESTEVA,

Debtor.

_____

LORENZO ESTEVA,
a Florida resident,
DENISE OTERO VILARINO,
a Florida resident,

Plaintiffs-Appellees,

*versus*

UBS FINANCIAL SERVICES, INC.,
a foreign corporation,
UBS CREDIT CORP,
a foreign corporation,

Defendants-Appellants.

_____

Appeal from the United States Bankruptcy Court
for the Southern District of Florida
B.C. Docket No. 1:19-ap-1047-LMI

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and LUCK, Circuit Judges.

GRANT, Circuit Judge:

After years of serving as a financial advisor, Lorenzo Esteva landed a new job.  The firm that hired him, UBS, loaned him $2 million as an enticement to join.  Esteva says those funds were to "bridge the financial gap in commissions resulting from the move from another financial services firm," while UBS counters that they were "straightforward loans."  Either way, Esteva deposited them into a UBS account he held jointly with his wife.

Things quickly unraveled from there—Esteva's behavior as an advisor had long been less than pristine.  Nineteen months after he signed with UBS, Esteva's decades-long history of mishandling client funds was exposed, and he was legally barred from working as a financial advisor.  He soon filed for bankruptcy, which was followed by years of litigation with UBS and other creditors.

The core of the parties' dispute is this: Esteva says UBS cannot access the $2 million because the account is jointly held with his wife.  That makes it a tenancy by the entireties, which

protects the funds from creditors.[1]  UBS, for its part, insists that the couple granted it a lien on their bank account.  And even if not, the bank says, Esteva defrauded UBS when he transferred the funds beyond its reach.  The bankruptcy court sided with Esteva on all claims, and granted summary judgment in his favor.

We see things a little differently.  Because contractual ambiguities prevent the entry of summary judgment on the lien claims, and UBS presented enough evidence to support its counterclaim for constructive fraudulent transfer, we reverse in part and remand for further proceedings.

## I.

Following what seemed to be a successful career at Merrill Lynch, Lorenzo Esteva was hired as a financial advisor by UBS, a Swiss-based bank and wealth-management firm.  As part of its hiring package, UBS advanced Esteva four promissory notes worth a total of about $2 million.  He promised to repay them over the first ten years of his employment (or immediately if he left UBS before then).

When Esteva received the funds, he deposited them into a UBS account that he had opened jointly with his wife, Denise Otero Vilarino.  For what it's worth, all parties seem to agree that

---

[1] Although the parties frequently refer to the doctrine as "tenancy by the entirety," the relevant cases generally use the phrase "tenancy by the entireties" so we will follow their lead.  *See, e.g.*, *Havoco of Am., Ltd. v. Hill*, 197 F.3d 1135, 1136–40 (11th Cir. 1999); *Beal Bank, SSB v. Almand & Assocs.*, 780 So. 2d 45, 48–61 (Fla. 2001).

UBS required its employees to keep investment accounts exclusively with UBS.  According to Esteva, he also transferred $500,000 from a Merrill Lynch account that he and Otero had opened when he worked there.

The new UBS account, known as the "House Account," was governed by a UBS Client Relationship Agreement that Esteva and Otero both signed.  The Agreement included a lien provision: "you hereby grant to each UBS Entity a security interest in and lien on any and all Property held or carried by any UBS Entity for you or on your behalf in or credited to any UBS Account(s)."  And, it continued, "the account holders are jointly and severally liable for all obligations with respect to the Account."

Less than two years later, Esteva was fired.  An internal UBS investigation had revealed that for over fifteen years Esteva had both falsified account statements and transferred funds between client accounts without permission.  The Financial Industry Regulatory Authority banned him from working in the financial industry for life because of this serious misconduct.

Despite the premature end to his employment, Esteva did not return the loaned funds as the promissory notes demanded.  So UBS froze the House Account, which still contained about $2 million.  Nearly a year later, Esteva petitioned for bankruptcy under Chapter 7, and later switched to Chapter 11.  He listed the UBS House Account as exempt from the bankruptcy estate as a tenancy by the entireties, which protected his wife's interest in it under Florida law.

Unhappy that the UBS freeze blocked access to the account, Esteva and Otero also filed an adversary complaint against UBS. They raised four claims, seeking (1) a declaratory judgment that the House Account was exempt as a tenancy by the entireties; (2) a declaration that UBS lacked a valid security interest, lien, or right of setoff against the account; (3) turnover of the funds in the account; and (4) damages for unjust enrichment. Esteva premised the unjust enrichment claim on UBS's alleged retention of his "book of business" after it fired him. UBS responded with counterclaims for good measure, four in total: (1) a declaratory action to clarify that UBS had a perfected security interest in the House Account under New York law, (2) a fraudulent transfer claim under Florida law seeking the return of the promissory note funds, (3) a contractual setoff of mutual debt under federal law, and (4) a common law setoff claim.

Esteva moved for summary judgment on all claims and counterclaims except for the amount of damages owed on his unjust enrichment claim. The bankruptcy court agreed and rendered an oral ruling (followed by a short written order) granting summary judgment in Esteva's favor on all claims. Its partial final judgment resolved all issues other than damages for unjust enrichment, and the district court affirmed without analysis.

UBS's first try at appeal ended in a jurisdictional dismissal by this Court because the unjust enrichment damages were still pending before the bankruptcy court and the parties had secured no Rule 54(b) certification. *Esteva v. UBS Fin. Servs. Inc. (In re Esteva)*, 60 F.4th 664, 670–71 (11th Cir. 2023). After a failed attempt

by the parties to create appellate jurisdiction by purporting to jointly dismiss the unjust enrichment count the day before oral argument, we dismissed the appeal because the judgment below was not a final order on all claims. *See id.* at 670, 675, 678–79.

A Rule 54(b) order from the bankruptcy court followed, and we granted permission to appeal.[2]

## II.

This Court reviews the bankruptcy court's order granting summary judgment de novo, "applying the same legal standard used by the bankruptcy court." *Marathon Petroleum Co. v. Cohen (In re Delco Oil, Inc.)*, 599 F.3d 1255, 1257 (11th Cir. 2010); *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). We view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1383 (11th Cir. 2024).

## III.

We first consider jurisdiction, and this time we have it. To start, we can hear appeals only from bankruptcy orders that the bankruptcy court had authority to enter—only "core" proceedings qualify. *Wortley v. Bakst*, 844 F.3d 1313, 1317 (11th Cir. 2017). And under federal law, core proceedings are those "that implicate the property of the bankruptcy estate and either invoke substantive

---

[2] In that order, we directed the parties to brief whether any of the issues raised in the appeal are non-core matters, whether any such non-core matters had to be resolved to decide the core matters, and whether the core matters could be heard despite the presence of any potential non-core matters.

rights created by federal bankruptcy law or that exist exclusively in the bankruptcy context." *Id.* at 1318.

Most of the claims and counterclaims on appeal are easily sorted into the core bucket. The disposition of the House Account directly affects Esteva's bankruptcy estate because the issues concern whether it is exempt from that estate, and if not, whether UBS has a lien on it. Each of them thus "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process" and is statutorily core. *Id.* at 1319 (quotation omitted). And all the claims and counterclaims other than fraudulent transfer easily fall into the category of constitutionally core. *See Stern v. Marshall*, 564 U.S. 462, 487–92 (2011). And for these, we are satisfied that the parties have consented to the bankruptcy court's jurisdiction to enter a final judgment on them, which means the bankruptcy court had jurisdiction over them.[3] *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 685–86 (2015).

One last point before we turn to the merits. A (very) late-filed motion raised the specter of mootness, arguing that developments in the bankruptcy proceeding made the result of this appeal and the status of the House Account irrelevant. We caution counsel to be more discerning about whether such eve-of-

---

[3] Esteva's unjust enrichment claim, however, is not before this Court. The bankruptcy court certified final judgment on all the other claims and counterclaims, "leaving only the remaining unrelated unjust enrichment claim, Count Four of the Complaint." So that claim cannot be appealed right now. *See* Fed. R. Civ. P. 54(b); Fed. R. Bankr. P. 7054(a).

argument motions are appropriate and have little trouble rejecting this one.

The case is not moot because the bankruptcy court repeatedly recognized that its resolution of the bankruptcy plan was contingent on this appeal: the Confirmation Order, Reorganization Plan, and Disclosure Statement all contain provisions accounting for the pending appeal. The Confirmation Order, for one, noted that the bankruptcy court retained jurisdiction to enter orders as may be "necessary to enforce the Partial Final Judgment against UBS Financial including turnover and or writs of execution after resolution of the 11th Circuit Court of the Appeal [sic] in favor of the Debtor, or enter an Order converting or dismissing the case if the Appeal is decided in favor of UBS Financial."

Nor does equitable mootness come into play. That doctrine allows courts reviewing bankruptcy appeals to reject challenges "when effective relief would be impossible" because the bankruptcy court's orders "have gone into effect and would be extremely burdensome . . . to undo." *Bennett v. Jefferson County*, 899 F.3d 1240, 1242, 1247 (11th Cir. 2018) (quotation omitted). But most of Esteva's reorganization plan remains unconsummated, leaving no metaphorical eggs to be unscrambled. *See id*. at 1248. The money, in short, is still in the account. And in any event, Esteva's last-minute motion to dismiss this appeal well over two years after the reorganization plan was entered hardly points the equities in his favor. We deny Esteva's motion.

## IV.

We now turn to the merits, and first consider the parties' competing arguments about whether UBS has a lien on the funds in the House Account. That is a close question—one that depends on the meaning of ambiguous terms.

The provisions of the Client Relationship Agreement that Esteva and Otero signed are key. *First*, it granted a lien: As "security for the payment of all liabilities or indebtedness presently outstanding or to be incurred under this or any other agreement between you and any UBS Entity . . . you hereby grant to each UBS Entity a security interest in and lien on any and all Property held or carried by any UBS Entity for you or on your behalf in or credited to any UBS Account(s)." *Second*, it explained that "the account holders are jointly and severally liable for all obligations with respect to the Account."

Although Florida law governs the House Account, the Agreement states—and the parties agree—that New York law controls our interpretation of its provisions. Under New York law, if "a contract's provisions are subject to more than one or conflicting reasonable interpretations, the agreement will be considered ambiguous, requiring a trial on the parties' intent." *Berkeley Rsch. Grp., LLC v. FTI Consulting, Inc.*, 69 N.Y.S.3d 26, 29 (N.Y. App. Div. 2018); *see also Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 396 (2d Cir. 2023). As we explained in another case applying New York contract law, when "the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be

resolved on a motion for summary judgment," because the "meaning of an ambiguous contract term is an issue of fact." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (quoting *Eden Music Corp. v. Times Square Music Publ'ns Co.*, 514 N.Y.S.2d 3, 5 (N.Y. App. Div. 1987)).

Also relevant is Florida law, which governs the House Account itself and protects spousal rights in shared property. A tenancy by the entireties is present when two spouses hold "an indivisible right to own and occupy the entire property." *Havoco of Am., Ltd. v. Hill*, 197 F.3d 1135, 1139 (11th Cir. 1999) (quotation omitted). This doctrine ensures that "creditors cannot levy on entireties property to satisfy the debt of an individual spouse." *Id.* (alteration adopted and quotation omitted). Here, the House Account is a tenancy by the entireties, which means UBS cannot simply recover the money Esteva owes. So the question is whether Esteva granted UBS a lien on the House Account, and if so, whether that lien altered his wife's rights in the account in a way that overcomes its status as a tenancy by the entireties.

Those questions do not have clear answers. The lien granted by the Agreement applies to obligations "incurred under this or any other agreement between *you* and any UBS Entity." (emphasis added.) On the one hand, Esteva has a strong argument that "you" in the Agreement is singular and refers only to him—not his wife. And only Esteva signed the promissory notes, meaning that only Esteva incurred a debt to UBS for those notes. So, Esteva says, the "you" in that part of the sentence refers to him, as the only person who had another "agreement between" himself

"and any UBS Entity."  Esteva also points out that some of the boilerplate terms seem to treat "you" as singular—for one, the Agreement defines the word as "you as *a* client of UBS," not as "*clients* of UBS." (emphasis added.)  That, he says, means that the Agreement shows that only *he* granted a lien to UBS—not his wife too.

He may be right.  But Esteva's singular "you" argument reads a lot of meaning into drafting choices that may not be as straightforward as he suggests, and provides a thin basis for concluding that the contract unambiguously excludes Otero from UBS's security interest.  For one, English lacks separate words for the second person singular and plural.  Given that, we generally read the singular to include the plural (and vice versa) rather than hanging interpretations on the drafter's use of singular or plural. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 129–31 (2012) (explaining the gender/number canon).  On top of that, Esteva overlooks that the provision covers not only "any *other* agreement between you and any UBS Entity" but also "*this*" agreement, which his wife was certainly a party to. (emphasis added.)  So the same "you" may—at least in that context—be read to include his wife.

And even if Esteva is right about the lien provision, that would not be the end of the interpretive project.  The joint and several liability clause arguably expands his wife's obligations to include Esteva's promissory notes.  *See* Restatement (Second) of Contracts §§ 288–89 (Am. L. Inst. 1981).  Her agreement that "the account holders are jointly and severally liable for all obligations

with respect to the Account" broadens her liability at least in some respects. Because the security interest provision already granted UBS a security interest against Esteva, this provision may make her jointly and severally liable for that obligation, defeating the tenancy by the entireties. So by signing the Agreement, Esteva's wife may have expressly accepted an equal share in the account's liability for that debt.

True, what the word "obligations" refers to in this provision could be considered ambiguous: does it include only responsibilities directly tied to holding an account (such as paying fees and filing tax forms) or does it encompass other obligations owed to UBS (like the promissory notes)? Esteva says the former, and UBS the latter. But that is exactly why this issue should not be decided at summary judgment—the contract is ambiguous. And under New York law the interpretation of an ambiguous contract cannot be resolved as a matter of law. *Berkeley Rsch. Grp.*, 69 N.Y.S.3d at 29.

Because these competing arguments render each interpretation plausible and fail to exclude the other, a decision on the meaning of these provisions is "an issue of fact" that was not ripe for resolution at summary judgment.[4] *W. Grp. Nurseries*, 167 F.3d at 1360.

---

[4] Summary judgment for Esteva on his turnover claim was also improper for the same reason. "Turnover proceedings are not to be used to liquidate disputed contract claims." *Charter Crude Oil Co. v. Exxon Co., U.S.A. (In re Charter Co.)*, 913 F.2d 1575, 1579 (11th Cir. 1990). And, as we just explained,

## V.

UBS argues fraudulent transfer in the alternative, insisting that if Esteva's deposit into the House Account put those funds beyond its reach, he defrauded UBS and his other creditors. Florida law provides two paths to finding fraudulent transfer—actual intent and constructive intent. Fla. Stat. §§ 726.105(1)(a)–(b), 726.106. UBS argues that it has raised a jury issue along both paths. We disagree on the actual-intent theory, but agree for the constructive-intent claims.

## A.

The first type of fraudulent transfer involves an actual intent to defraud, applying to transfers made by a debtor with "actual intent to hinder, delay, or defraud any creditor of the debtor." Fla. Stat. § 726.105(1)(a). The statute lists indicia of fraud for courts to consider, including transferring funds "to an insider," the debtor retaining possession of the property, or the debtor becoming insolvent shortly after the transfer was made. *Id.* § 726.105(2). UBS contends that Esteva did all three when he deposited the money in an account jointly held with his wife and then filed for bankruptcy after he lost his job.

Whatever the merits of this argument, the bank did not preserve it. The bankruptcy court saw a concession: "UBS conceded that there was no basis for me to find that the house account was created with actual fraudulent intent." UBS insists,

---

the contract is disputed. Esteva does not contest that his turnover claim rises and falls with the lien issue.

however, that it only waived a sub-argument, not its main actual-intent fraudulent transfer claim.  Intent to "defraud," it notes, is only one of the three types of intent that can constitute actual-intent fraudulent transfer—an intent to "hinder" or "delay" also suffices.  *Id.* § 726.105(1)(a).  Moreover, UBS says, its real theory is that Esteva fraudulently transferred the funds by *depositing* them into the account rather than by *creating* the account.

It is hard to sort out the exact scope of the UBS waiver because the bank failed to provide a transcript of the hearing at which it conceded at least part of its actual-intent claim.  No matter—that claim is no longer viable in any event because UBS failed to defend any actual-intent theory at all in its opposition to Esteva's motion for summary judgment.  On a record that reflects a waiver of UBS's actual-intent claim, that includes no transcript to narrow the scope of that concession, and that contains no defense of that theory before the bankruptcy court, we have no basis for concluding that UBS preserved the theory.

**B.**

UBS fares better in its constructive-intent claims.  Florida has two relevant statutes.  Under the first, constructive fraudulent transfer occurs when a debtor does not receive "a reasonably equivalent value in exchange for" a "transfer or obligation," plus (1) the debtor was engaged in (or about to engage in) a transaction that would leave his remaining assets "unreasonably small in relation," or (2) the debtor intended to incur or reasonably should have known that he was about to incur a debt beyond his ability to pay.  Fla. Stat. § 726.105(1)(b).  Under the second statute, a "transfer

made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.* § 726.106(1).

Here there are no waiver issues, and UBS has shown a genuine dispute of material fact under both statutes. Esteva received no equivalent value for transferring the funds to the House Account—in fact, he received nothing in return at all. Under his own theory, that transfer removed the funds from his personal estate and placed them in a protected joint tenancy by the entireties with his wife beyond the reach of creditors. That means he received no reasonably equivalent value in exchange for the transaction, satisfying the first requirement of both statutes. *See id.* §§ 726.105(1)(b), 726.106(1).

Next, the transaction made his remaining assets unreasonably small to repay his creditors. He took on $2 million in obligations, while severing his control over the only assets that were sufficient to repay them, and that fulfills the other requirement of the first constructive-fraudulent-transfer statute. *See id.* § 726.105(1)(b).

The second statute requires a bit more—the debtor has to either be insolvent or become insolvent because of the transfer. *Id.* § 726.106(1). But even under that standard, UBS has shown enough. Esteva had just incurred a $2 million debt and placed all

of the funds in an account that (according to his own logic) his creditors could not access, all while engaging in illegal conduct that threatened permanent expulsion from his profession. And Esteva admits that he was the only wage earner for his family, meaning his illegal activities jeopardized his entire income stream and thus his ability to repay the debt he had taken on.

Florida "law is clear that a debtor may not transfer property owned by himself, individually, to himself and his wife as tenants by the entireties if such a transfer will defraud creditors by putting that property beyond the creditors' reach." *Valdivia v. Valdivia*, 593 So. 2d 1190, 1192 (Fla. Dist. Ct. App. 1992). In fact, a person's assets for purposes of the fraudulent transfer statutes exclude any "interest in property held in tenancy by the entireties to the extent" that "a creditor holding a claim against only one tenant" cannot access it. Fla. Stat. § 726.102(2)(c); *see also id.* § 726.103(1). These facts are enough to prevent summary judgment in the constructive-fraudulent-transfer context.

The bankruptcy court's contrary arguments do not withstand scrutiny. The court concluded that Esteva's ongoing illegal conduct did not give him reason to believe that he would engage in transactions that would leave him unable to satisfy his creditors because he had gotten away with it for so long. Because Esteva "had been doing this illegal trading for years with impunity," the court found that "a more likely interpretation is that in Mr. Esteva's mind, he was never going to get caught."

That inference is a curious one, to say the least. Indeed, the opposite conclusion—that the more crimes one commits, the more

likely they are to be discovered—is just as reasonable. Maybe more so. But even beyond that, a court's view of the "likely interpretation" of a factual question like Esteva's intent is not enough to allow summary judgment. *See Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015).

The bankruptcy court's further musing that the transfer to the House Account was "for value" because "the proceeds of the loans were income, and upon marriage each spouse's income is marital property" is somewhat confusing. For one, the two Florida cases that the court cited concern divorce proceedings. *See Rosenfeld v. Rosenfeld*, 597 So. 2d 835 (Fla. Dist. Ct. App. 1992); *Steiner v. Steiner*, 746 So. 2d 1149 (Fla. Dist. Ct. App. 1999). But in any event, the bankruptcy court did not actually rely on this marital-property argument. Instead, it chose not "to invite additional legal argument on that issue" because it found that no material dispute about Esteva's ability to repay existed, as discussed above. Because we see a dispute, we reverse the entry of summary judgment on the constructive-fraudulent-transfer counterclaim.

## VI.

We last turn our attention to UBS's setoff counterclaims. "Setoff is an established creditor's right to cancel out mutual debts against one another in full or in part." *B.F. Goodrich Emps. Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 508 (11th Cir. 1992). It seeks to avoid the "absurdity" of compelling a creditor to pay money to a debtor. *Id.* (quotation omitted). But "no federal right of setoff is created by the Bankruptcy Code." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995). So a bankruptcy setoff must

be both grounded in a substantive "right to setoff"—generally created by state law—and meet the requirements specified by the Bankruptcy Code in § 553. *Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.)*, 940 F.2d 1507, 1512 (11th Cir. 1991).

UBS's third counterclaim seeks a setoff under § 553 of the Bankruptcy Code and states that the Client Relationship Agreement created such a right. But those allegations do not state a complete claim. Section 553 provides limits on the enforcement of state setoff laws—it "does not create a right of setoff." *In re Patterson*, 967 F.2d at 509; 11 U.S.C. § 553. So substantive law— "usually state law"—is needed to determine the validity of a setoff claim that is subject to the requirements of § 553. *In re Patterson*, 967 F.2d at 509. A claim premised solely on that section is incomplete, and UBS's lone reference to the Client Relationship Agreement cannot plead a substantive right to setoff without any reference to another law creating such a right. *See In re Orexigen Therapeutics, Inc.*, 990 F.3d 748, 753 & n.8 (3d Cir. 2021).

UBS's other setoff claim, Counterclaim IV, gets further because it at least invokes "common law setoff" in the count's caption. (capitalization altered.) But that is about as far as it goes— UBS offers no further connection to Florida law. Instead, it again relies on UBS's entitlement to a setoff "[p]ursuant to 11 U.S.C. § 553(a)." A vague allusion to a common law setoff in a count caption combined with a reference to a federal bankruptcy provision that limits substantive setoff rights under state law does not state a claim for setoff. As a result, we agree with the bankruptcy court that UBS's setoff counterclaims cannot proceed.

★    ★    ★

We **DISMISS** UBS's appeal of the entry of partial summary judgment on the unjust enrichment claim; **REVERSE** the entry of summary judgment for Esteva on the tenancy-by-the-entireties, lien, turnover, and constructive-intent fraudulent transfer claims and counterclaims; and **AFFIRM** the entry of summary judgment on UBS's actual-intent fraudulent transfer and setoff claims. And we **DENY** Esteva's motion to dismiss this appeal as moot.